[Cite as *State v. Gamble*, 2014-Ohio-1277.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                  :

                                  :       Appellate Case No. 25639

        Plaintiff-Appellee         :

                                    :       Trial Court Case No. 2012-CR-3218

v.                                  :

                                    :

BARTON D. GAMBLE          :       (Criminal Appeal from

                                    :        Common Pleas Court)

        Defendant-Appellant       :

                                    :

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of March, 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE PHIPPS, Atty. Reg. #0069829, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
       Attorney for Plaintiff-Appellee

J. ALLEN WILMES, Atty. Reg. #0012093, 7821 North Dixie Drive, Dayton, Ohio 45414
       Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.,

{¶ 1}     Barton Gamble and A. had sex in Gamble's apartment. Gamble says the sex

was consensual; A. says it was not. The sexual assault nurse examiner who conducted a rape

examination on A. saw injuries consistent with sexual assault. The jury believed A., and Gamble was convicted of rape and kidnaping. The nurse's testimony was within the realm of her expertise and admissible, and the jury could reasonably believe the testimony of A. We affirm.

## I. THE TRIAL

{¶ 2} The state and the defense each presented the testimony of several witnesses. Among them were A.; one of A.'s daughters; the sexual assault nurse examiner; S., Gamble's brother; Gamble's wife; and Gamble himself.

### A. A.'s testimony

{¶ 3} This was A.'s testimony at trial. In early October 2012, she rented a room, with three of her children and her then boyfriend, W., at a house in Dayton. The owner of the house was S., whom W. knew. The house was a "bootleg place," a weekend party house.

{¶ 4} During the afternoon of October 22, 2012, A. and her children were in the house when Gamble knocked on the door. A. did not know Gamble, though she had seen him at the house at one of the weekend parties. Gamble asked if S. was there and A. told Gamble that he was not. A. and Gamble stood on the porch chatting. He asked her why she was staying at that house and asked her about her situation. She told him that she had lost her apartment and had been homeless for a while. Gamble then offered A. $500 to help her get on her feet, but A. told him that she didn't want the money. Gamble asked if she was looking for another place to stay. She said that she was, and he told her that he had an apartment for rent. Gamble then left but returned 15 to 20 minutes later and told A. that if she was not doing anything, he could take her to see the apartment. A. agreed.

{¶ 5} Gamble drove A. and her children to a subsidized-housing apartment complex

run by the Dayton Metropolitan Housing Authority (DMHA). A. thought there was a problem with renting out a DMHA apartment and asked Gamble about this. He told her that it was his apartment, that he and his wife had moved out but that he still had the keys. A. told Gamble that she didn't want the apartment, but Gamble insisted that she just look at it. When they got inside, the children went into the kitchen, and Gamble told A. to look upstairs. Shortly after, Gamble came upstairs and found A. looking at the master bedroom, which held a bed, dresser, and clothes. Gamble stood in the doorway and asked A. if she wanted the apartment. She told him that she didn't because it was a DMHA apartment. Gamble then asked her about the fathers of her children, specifically the father of her son. A. told Gamble that her son's father, G., was in jail for killing her brother. Gamble looked shocked and said that G. was his cousin.

{¶ 6}   A. was ready to leave, and she got up from the bed, where she had been sitting, and told Gamble that he could drop them off. Gamble said no and pushed her back onto the bed. He then reached over to the dresser, pulled out a gun, and slammed it on the dresser top. Gamble asked A. if S. (her landlord and Gamble's brother) knew who she was. A. told him that S. had never asked. Gamble told her that if S. and his family found out who she was, they were "going to get" her. (Tr. 164). A. again got up and asked Gamble to drop her off. He again pushed her back onto the bed. Gamble then ripped down her pants, laid on top of her, and inserted his penis into her vagina. A. began crying very loudly. She tried to push Gamble off, but his weight held her down. Gamble repeatedly told her to "[s]top crying like a little bitch." (Tr. 166).  Gamble ejaculated inside A. and then told her to go to the bathroom and wipe herself. He followed her into the bathroom, gave her a towel, and stood there while she cleaned herself. When Gamble heard A.'s son crying, he let her out of the bedroom. A. was still crying when she went

downstairs, and her children asked her what was wrong. She did not respond.

{¶ 7} They all went outside, and the children got into the car. Gamble pulled A. aside and told her that if what had happened got out, he would lose everything, including his wife. Gamble then told her that he had decided that she and the children should spend the night in the apartment. A. was still crying and pleaded with Gamble to drop them off. Gamble told her that he would ask the children if they wanted ice cream and if they did they had to stay the night. Gamble went to the car and asked the children if they wanted ice cream, and they said that they did.

{¶ 8} Everyone went back into the apartment. Gamble told A. to go upstairs, and she obeyed. A. was worried about her safety and that of her children. After telling the children to go into the kitchen, Gamble went upstairs too, and they again went into the master bedroom. Gamble pulled down A.'s pants, got on top of her, and again inserted his penis into her vagina. A. tried to push Gamble off but was not able to move. This time, she did not see a gun and did not know what had happened to it. Gamble did not have time to ejaculate because the children were screaming. He got up and told A. to put on her clothes and get the kids into the car so that he could drop them off.

{¶ 9} When they arrived back at A.'s house, Gamble told the children to get out of the car. When A. tried to open the car door, Gamble yanked her back by the arm and told her that "it better not get out because he can lose everything." (Tr. 173-174). She went into the house, sat on the edge of her bed, and cried.

{¶ 10} Later, A. called W. (her boyfriend) at work and asked him to hurry home. W. asked A. what was wrong, but she would not tell him. W. could not leave early and did not arrive until around 1:00 a.m. the next day. Later that day, they called S. (Gamble's brother) and told him

what had happened. S. called Gamble and asked him why he raped A. Gamble said that he did not know what S. was talking about and that he never took her to the apartment. A. heard some of the phone conversations with Gamble because the speakerphone was on. She heard Gamble say that he wanted to offer her $1,000 not to say anything. A. told him that she would not take the money.

{¶ 11} That same day, S. took A. to Miami Valley Hospital for a rape examination. At the hospital, A. met with a police officer and told him what had happened. She also told the sexual assault nurse examiner, Lori Kinley, about the rape. The police officer told A. to report to the Dayton Police Department. She didn't go because she was scared of Gamble's family and thought that going to the police would only make things worse.

{¶ 12} The next day, A. was at her house when detectives knocked on the door. They told her that she needed to report to the police department the next day. This time, A. went. At the police department, she told a detective what had happened. She told the detective that she never agreed to have sex with Gamble for money, that she and Gamble never talked about money for sex.

**B. Gamble's testimony**

{¶ 13} Gamble admitted that he had sex with A. but said that it was consensual sex in exchange for money. This was his testimony. During the conversation with A. on the porch, he did not offer her money or try to convince her to rent his apartment. Rather, the conversation, at some point, turned to money and sex, and A. offered to have sex with him twice for $150, which he accepted. They talked about where they could do it, and Gamble told her that he had an apartment that he didn't live in that they could use. When they got to the apartment, they sent the

girls to the park and A.'s son stayed in the apartment and played. He and A. then went upstairs and had sex in the master bedroom. Afterwards, A. went downstairs to see if the girls were back from the park. When she came back upstairs, she said to Gamble, "Let's get this over with. Let's get it done." (Tr. 500). They then had sex for a second time.

{¶ 14}  Gamble and A. went downstairs and then outside to smoke. A. asked for her money, and Gamble told her that he didn't have it. While they were outside, they heard gun shots, and a neighbor told them that someone had been shot in the nearby park. Gamble went to the park with the neighbor, telling A. that he would be right back. The police were at the park, and Gamble stayed there for 15-20 minutes. When he got back to the apartment, they drove back to A.'s house. A. again asked Gamble for her money. When he told her that he didn't have it, she was angry. Gamble testified that the last thing A. said to him was, "'You're not gonna like * * * what I'm gonna do if you don't pay me my money.'" (Tr. 544). Gamble testified that, when they arrived at her house, he never grabbed A.'s arm to pull her back into the car.

{¶ 15}  During the following two days, there were several phone calls between him and S.  Gamble told his wife what had happened, and she was present for several of the phone calls. He testified that he never offered A. $500 or $1,000, that he was not going to pay an "extortion fee." (Tr. 511).

### C. Corroborating testimony

{¶ 16}  A.'s 11-year-old daughter, T.A., testified about the events at the apartment. Before A. and Gamble went upstairs, he told the children to go into the kitchen or go to the nearby park. T.A. and her sister went to the park and their brother stayed in the apartment and

played in the kitchen. When she and her sister came back to check on their brother, she stood at the bottom of the stairs and called her mother's name, but her mother didn't answer. T.A. and her sister then went back to the park, and when they came back, T.A. again called her mother from the bottom of the stairs. This time, she heard her mother yelling, "Get off of me." (Tr. 237). When her mother came downstairs, she looked sad and was crying. When they came back into the apartment the second time, Gamble turned up the music and told the kids to stay in the kitchen and not to come out. Gamble and her mother went upstairs, and when her mother came down, she was crying even more. After Gamble dropped them off, her mother burst out crying. T.A. had never seen her mother cry like that before.

{¶ 17} S. testified that he was shocked when W. told him what had happened to A., and he wanted to find out what was going on. When S. talked to Gamble, Gamble admitted that he took A. to show her the apartment because he did not believe that S.'s house was safe. And Gamble admitted that he and A. had consensual sex there. Several phone calls went back and forth between S., W., A., and Gamble. During their conversations, money was mentioned, though not by Gamble.

{¶ 18} Gamble's wife testified that she overheard speakerphone conversations between S. and her husband. On S.'s end, besides S.'s voice, she heard another man's voice and a woman's voice. She said that Gamble never offered money but that the others told him to offer it.

### D. Lori Kinley's testimony

{¶ 19} Lori Kinley, the sexual assault nurse examiner who conducted the rape examination on A. at the hospital, described to the jury what she saw during her examination. She testified that she saw multiple superficial tears in A.'s perineal area, the area between the vagina

and the rectum. A superficial tear is basically a tearing of the tissue, Kinley explained, and such tearing is a good indicator of blunt force trauma. Kinley told the jury that such tears in the perineal area are consistent with the type of injuries often seen on someone who has been sexually assaulted. Kinley also testified that she saw "a large amount of white colored vaginal discharge on the vaginal face-or on the-in the vaginal vault, as well on the face of her cervix." (Tr. 275).

### E. After the testimony

{¶ 20}   While the jury was deliberating, it sent a question to the trial judge asking if it could view or read Kinley's testimony about A.'s perineal area injuries. The judge, the prosecutor, and defense counsel agreed to answer the question this way: "If you wish to view Nurse Lori's testimony, you must view all of it. Otherwise, you are to use your collective recollection to determine the facts in this case." (Tr. 643).

{¶ 21}   Gamble had been charged with two counts of rape, one count of kidnaping, and one count of retaliation, and each of these counts included a firearm specification. The jury found Gamble guilty on both rape charges and the kidnaping charge, but it found him not guilty of retaliation. The jury also did not find that Gamble had a gun. The trial court sentenced him to a total of 11 years in prison.

## II. ANALYSIS

{¶ 22}   Gamble presents three assignments of error for our review. One claims that his trial counsel rendered him ineffective assistance. Another alleges that Kinley, the nurse who examined A., should not have been allowed to testify as an expert. The remaining assignment of

error alleges that the jury's verdict is against the manifest weight of the evidence.

## A. The Claim for Ineffective Assistance of Counsel

{¶ 23}   The second assignment of error alleges that Gamble was denied the effective assistance of trial counsel. The Sixth Amendment gives a criminal defendant "'the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), quoting *McMann v. Richardson*, 397 U.S. 759, 771, fn. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). An ineffective-assistance-of-counsel claim has two elements. "First, the defendant must show that counsel's performance was deficient." *Id*. at 687. "[T]he proper standard for attorney performance is that of reasonably effective assistance." (Citations omitted.) *Id*. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 687-688. "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Gamble contends that the cumulative effect of eight of his trial counsel's failures to object amount to deficient performance that prejudiced the defense.

{¶ 24}   First, Gamble contends that counsel should have objected to the prosecutor's repeated use of leading questions. "A leading question is 'one that suggests to the witness the answer desired by the examiner.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565 at ¶ 149, quoting 1 McCormick, *Evidence*, Section 6 (5th Ed.1999). Gamble gives one example, which occurred during A.'s direct examination:

Q The only monies that were talked about were the initial 500 to help you–

A Yes.

Q –and then on the back end, a thousand to shut you up, I guess?

A Yes.

(Tr. 196-197). These questions are not leading. The prosecutor was merely restating A.'s earlier testimony:

A * * * He [Gamble] then said that he wanted to offer me

$1,000.00 not to say anything.

* * *

Q Okay. So now there's another offer of money to you–

A Yes.

Q –for $1,000 to keep quiet?

A Yes.

(Tr. 182).

**{¶ 25}** Gamble cites no other question that he alleges is leading.

**{¶ 26}** Second, Gamble contends that counsel should have objected to Kinley's testimony about the superficial tears in A.'s perineal area. Gamble contends that the testimony is irrelevant because he was on trial for rape, which requires penetration. The perineum, he points out, is not a penetrable opening. The testimony is relevant. Penetration was not really an issue at trial, since Gamble admitted that he had sex with A.. The primary issue was whether the sex was by force or threat of force. Kinley testified that these kinds of tears are often the products of blunt force to the perineal area and are injuries consistent with sexual assault. The testimony is relevant to the issue of force.

{¶ 27} Third, Gamble contends that counsel should have objected to Kinley's testimony about the white vaginal discharge that she saw. Kinley testified that she saw "a large amount of white colored vaginal discharge on the vaginal face-or on the-in the vaginal vault, as well on the face of her [A.'s] cervix." (Tr. 275). To the prosecutor's question about what the discharge indicated, Kinley replied that "it can be indicative of a lot of different things. It can be indicative of infection. It can be indicative of, you know, some sort of substance that's in her vagina that was not, you know, not inherent to the vagina itself. It could be semen." (Tr. 276). Kinley took a swab of the discharge for analysis, but she did not know the results, nor did the state present the results otherwise. Gamble says that the testimony about the vaginal discharge is irrelevant because no evidence was presented that links the discharge to him.

{¶ 28} While defense counsel did not object to Kinley's testimony about what she saw, counsel did object to her testimony about what the vaginal discharge could indicate. And what it indicates is the important part because if it was Gamble's semen, then the fact that he had sex with A. is more likely, particularly in light of A.'s testimony that he ejaculated inside her. Regardless, we do not see any possible prejudice in this case, since there was testimony, including Gamble's own, where he admitted that he had sex with A.

{¶ 29} Fourth, Gamble contends that counsel should have objected to the prosecutor's questions alluding to the fact that Gamble was married. During the prosecutor's questioning of S., these exchanges occurred:

Q * * * Now, he's [Gamble] married, right?

A Yes. This was before he was married. He just got married.

Q He just got married. But he was married during this?

A Yes.

(Tr. 460).

Q Okay. Well, wasn't it an issue or didn't the topic come up that, "Hey, we really couldn't let this get out because Bart's wife was going to find out and that would be really bad for the family"?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled. You can answer.

(Tr. 470). Defense counsel's conduct cannot be deficient because he did object. Nor do we see any prejudice because Gamble himself testified that he was married:

Q Okay. Hold on. So you tell her [A.] you're married?

A Yes.

Q So she knew you were married.

A Absolutely.

(Tr. 521).

{¶ 30} Fifth, Gamble contends that counsel should have objected to the prosecutor's questions asking for details of his (Gamble's) prior offenses. These were the questions:

Q Mr. Gamble, I just want to make sure we're clear on your prior convictions. You have the weapons under disability charge, which is a firearm, correct?

A Yes, sir. It was a rifle.

Q Yep. And that was back in September of 2008? Sound about right?

A Yeah. Yeah, that's about right.

Q Yeah. And that was a felony, right?

A Yes, it is.

Q Okay. And your other felony conviction was for a burglary, home invasion?

A No, sir, there was no home invasion.

Q Well, that's what a burglary is, isn't it?

A I mean, it was–forgot–I–

Q Well, I don't want to argue with you about what it is–

A Yes.

Q –but it's a burglary conviction, correct?

A That's what you say, yes, sir.

Q Well, it's not what I say; it's what the termination entry says–

A Okay.

Q –which is dated 2005. Does that sound about right?

A Yes, sir.

(Tr. 513 514).

{¶ 31} Rule of Evidence 609 allows evidence of a defendant's prior convictions for the purpose of attacking the defendant's credibility. Evid.R. 609(A)(2). Also, Gamble admitted that he had prior felony convictions. His decision to take the stand and his admission raised the issues of his credibility and his convictions and opened the door to both. *Compare State v. Franklin*, 178 Ohio App.3d 460, 2008-Ohio-4811, 898 N.E.2d 990,  78 (7th Dist.) (saying that the defendant "brought up the issue of his felony convictions and his credibility" when he took the stand in his own defense and admitted on direct examination that he had prior convictions and that the defendant consequently "opened the door to this issue and to his credibility"). We note too that the trial court instructed the jury that it could use Gamble's prior offenses only in evaluating his credibility. This limiting instruction was sufficient to avoid unfair prejudice,

confusion of the issues, or misleading the jury.

{¶ 32} Sixth, Gamble contends that counsel should have objected, or moved to strike or for a mistrial, when during the prosecutor's questioning of S., the prosecutor asked a question that, Gamble says, suggests that he (Gamble) has a felony record:

Q Okay. Tell me about the gun. Did you know he had a gun?

A He ain't got no damn gun.

Q He ain't got no gun? You didn't have a conversation then in one of those cell phone conversations finding out that he had a gun and you were surprised to find out he-he had a gun?

A No.

Q Because you know he can't have a gun?

A I know he can't have a gun.

(Tr. 471). Gamble says that the last question indicated to the jury that he has a felony record-the reason he can't have a gun. But in Gamble's testimony quoted above in our discussion of the fifth alleged failure, Gamble admitted that he has felony convictions for having weapons under a disability and burglary. So even if the question were improper, there was no prejudice.

{¶ 33} Seventh, Gamble contends that counsel should have objected when the prosecutor asked him about using his subsidized apartment for storage. Gamble testified that he had moved out of the apartment but still had a five-month lease on it that he did not want to break. He was living in a large Centerville house and decided to downsize, Gamble said, so he bought a smaller house in Huber Heights. The smaller house could not fit all of the stuff in the large house, so he stored some of it in the apartment. The prosecutor then said, "so you were basically using this

government subsidized-taxpayer funded apartment for people to live, you were just using it as a storage facility?" (Tr. 530). Gamble says that the prosecutor's question was highly prejudicial and irrelevant. Even if the question concerned an irrelevant matter, we do not think that it resulted in prejudice. In light of all the evidence, the absence of this one statement would not have caused the jury to find him not guilty.

{¶ 34}  Lastly, Gamble contends that counsel should not have agreed to let the jury read all of Kinley's testimony because this gave undue weight to one witness's damaging testimony. "It is well settled that a trial court, upon a request from the jury, 'may cause to be read all or part of the testimony of any witness.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶123, quoting *State v. Berry*, 25 Ohio St.2d 255, 267 N.E.2d 775 (1971), paragraph four of the syllabus. Gamble fails to convince us that, in this case, the jury should not have been allowed to rehear the testimony. Given that the law allowed it, we cannot say that counsel's agreement was unreasonable. We note too, as the state points out, that the record does not indicate whether the jury actually decided to re-hear Kinley's testimony. So any claim of prejudice is "purely speculative." *Id*.

{¶ 35}  The ineffective-assistance-of-counsel claim fails.

{¶ 36}  The second assignment of error is overruled.

### B. Kinley's Testimony

{¶ 37}  The third assignment of error alleges that the trial court erred by permitting Kinley to testify as an expert. Gamble focuses on Kinley's testimony about A.'s perineal area injuries, contending that this testimony does not satisfy the Evid.R. 702 standard for expert

testimony.[1]

{¶ 38} Gamble says that Kinley's "failure to demand that the 'white vaginal discharge' exhibited by [the victim] be tested for diagnosis and causation refutes any contention that Nurse Kinley's testimony was 'based on reliable, scientific, technical or other specialized information.' [Evid.R. 702(C)(1).] Thus, she eschewed the opportunity to employ available scientific methods and so was not performing as an 'expert' in this matter." (Appellant Brief, 25). Contrary to Gamble's assertion, Kinley testified that she swabbed the discharge and that the swab was sent away for testing. The examination was Kinley's focus; the results of the testing were not her concern. That she did not seek out the results says nothing about her rape-examination expertise.

---

[1] Gamble also contends that the state failed to show the relevance of the testimony to the issue of vaginal penetration. We rejected this contention above. Further, Gamble asserts that Kinley's testimony that A.'s injury is "consistent with someone who has been sexually assaulted" is improper, lacks a foundation, and invades the province of the jury. Gamble fails to argue this assertion, so we do not consider it. *See* App.R. 12(A)(2).

{¶ 39} The state did not formally offer Kinley as an expert, nor did the trial court explicitly determine whether she qualified as an expert.[2] Typically, "[p]ursuant to Evid.R 104(A), the trial court determines whether an individual qualifies as an expert * * *." (Citation omitted.) *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 114. But if there is no challenge to an expert's qualifications, all but plain error is waived. *Id.* (saying that "[w]hile the state never formally tendered Lambert as an expert, defense counsel never challenged his qualifications to testify and thus waived all but plain error"). Gamble did not object to Kinley's qualifications, so he waived all but plain error.

{¶ 40} We see no plain error here. The prosecutor asked Kinley about her training and experience. Kinley said that she is certified as a sexual assault nurse examiner. To get this certification, she took specialized training, which included a 40 hour training course, and to keep the certification, she participates in ongoing training and does case reviews. Kinley has been certified for 15 years and has been doing rape examinations for 21 years. On average, she does around 10 examinations each year. Kinley has testified in other cases about sexual assaults and examining sexual-assault victims. And in one case, in which Kinley did not examine the victim, she was specifically declared an expert witness.

{¶ 41} Kinley's training and experience qualify her to testify at trial about sexual assault examinations and injuries. *Compare State v. Hartman*, 93 Ohio St.3d 274, 286, 754 N.E.2d 1150 (2001) (no plain error; the expert's experience qualified him to testify); *State v. Baston*, 85 Ohio St.3d 418, 423, 709 N.E.2d 128 (1999) (no plain error; the expert's experience and certifications qualified her to testify).

---

[2] Gamble filed a motion for a new trial on February 1, 2013, soon after the jury rendered its verdict, based on this fact. The court's ruling on the motion, if there was any, is not in the record.

**{¶ 42}** The third assignment of error is overruled.

## C. Weight of the Evidence

**{¶ 43}** The first assignment of error alleges that the jury's verdict is against the manifest weight of the evidence. Gamble was found guilty of rape by force or threat of force[3] and guilty of kidnaping for sexual activity[4]. Gamble admitted that he had sex with A.. The question was whether it was consensual, as Gamble testified, or non-consensual as A. testified.

**{¶ 44}** The manifest-weight test is this: "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve." *State v. Gilreath*, 174 Ohio App.3d 327, 2007-Ohio-6899, 882 N.E.2d 22, ¶ 14 (2d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." (Citation omitted.) *Id*. at ¶ 16.

**{¶ 45}** Gamble focuses his challenge on A.'s credibility and testimony. He contends that

---

[3] The pertinent provision in the rape statute provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

[4] The pertinent provision in the kidnaping statute provides that "[n]o person, by force, threat, or deception * * * shall * * * restrain the liberty of the other person * * * [t]o engage in sexual activity * * * with the victim against the victim's will." R.C. 2905.01(A)(4).

the jury clearly lost its way by believing her rather than him. A.'s testimony, says Gamble, is full of admitted lies, inconsistencies, and illogical statements. He points out that she never cried out or yelled. He also says that it is significant that, while at the apartment, she did not seek help from the police who were nearby investigating the shooting. He left A. alone and unconfined for about 15 minutes, Gamble says, yet she did not leave or cry for help. Nor did she ever call the police. And it was S. who finally took her to the hospital. Furthermore, Gamble says, A. admittedly lied to Kinley about what happened and lied to the examining physician, telling him she had been raped "rectally," (Tr. 215). She also lied to the social worker, giving her several false or non existent addresses where she would be living. A. was told to report the rape to the police, but she did not do so until they tracked her down and showed up at her door. Gamble asserts that a victim of a serious crime who was honestly reporting it should not hide from the police. Her conduct and lies, says Gamble, fully refute her testimony.

{¶ 46} We cannot say that the jury should have found A. incredible and rejected her testimony. She gave plausible explanations for her actions: she did not call the police because she was in shock; at the apartment she waited for Gamble and did not scream or yell or try to get help from anybody because she was scared, and she did not run because the children would not have been able to keep up; she did not go to the police because she was afraid of Gamble's family and thought that going to the police would make things worse; and she gave false addresses because she was afraid children's services was going to take her kids now that she was "on the radar," (Tr. 225). We see no patently apparent reason to reject A.'s testimony, so we defer to the jury's credibility determination.

{¶ 47} It is true that some evidence in this case weighs against Gamble's guilt, but

"'[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs *heavily* against the conviction.'" (Emphasis added.) *Thompkins* at 387, quoting *Martin* at 175. The evidence here does not weigh heavily against Gamble's convictions.

{¶ 48}   The first assignment of error is overruled.

{¶ 49}   The trial court's judgment is affirmed.

. . . . . . . . . . . . .


FAIN, J., and WELBAUM, J., concur.


Copies mailed to:

Mathias H. Heck
Michele D. Phipps
J. Allen Wilmes
Hon. Barbara P. Gorman