[Cite as *State v. Stinson*, 2015-Ohio-4405.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   26449 |
| | : | |
| v. | : | T.C. NO. 13CR237 |
| | : | |
| JESSE M. STINSON | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___23rd___ day of ____October____, 2015.

. . . . . . . . . .

DYLAN SMEARCHECK, Atty. Reg. No. 0085429 and KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorneys, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorneys for Plaintiff-Appellee

WILLIAM O. CASS, JR., Atty. Reg. No. 0034517, 135 W. Dorothy Lane, Suite 209, Kettering, Ohio 45429
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, P.J.

{¶ 1} Jesse M. Stinson was convicted after a jury trial in the Montgomery County Court of Common Pleas of four counts of murder, in violation of R.C. 2903.02(B), two counts of aggravated robbery (deadly weapon and serious physical harm), and one count

of aggravated burglary; each count included a firearm specification. The trial court also convicted Stinson, after a bench trial, of having weapons under disability. The murder and aggravated burglary convictions merged for sentencing, and the trial court imposed a sentence of 15 years to life in prison for murder; the aggravated robbery counts merged, and the trial court imposed 11 years in prison for that offense, and the court sentenced Stinson to 36 months for having weapons under disability. The firearm specifications also merged, and Stinson was ordered to serve three years for the firearm specification. The sentences were ordered to run consecutively, for an aggregate sentence of 32 years to life.

{¶ 2} Stinson appeals from his convictions, claiming that his convictions were based on insufficient evidence and against the manifest weight of the evidence, that the trial court erred in failing to grant his motion for a new trial, and that the aggravated robbery and murder offenses should have merged. For the following reasons, the trial court's judgment will be affirmed.

### I. Sufficiency and Manifest Weight of the Evidence

{¶ 3} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio

St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 4} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 ("'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 5} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 6} According to the State's evidence at trial, on October 10, 2012, Tyree North was shot in his home, located at 8180 Mount Charles Drive in Huber Heights, Ohio. The

shooter, Stinson, was in North's home to discuss Stinson's claim that North had "fleeced" him, i.e., sold him bad drugs. After North was killed, Stinson and another man took several items from North's home and transported them to another residence on Garfield Street. North's friend, James Demmons (aka "Bow"), had introduced Stinson to North and witnessed both the shooting and the robbery.

{¶ 7} In October 2012, North resided at the Mount Charles residence with his girlfriend, Chiaki Takahashi. The residence was a small ranch home with a kitchen to the left of the front door, a living room to the right of the front door, and two bedrooms along the rear wall of the house. The couple used one bedroom as a master bedroom, and North used the second bedroom (behind the living room) as a music studio, where he recorded, mixed, and remastered music. North both rented out the music studio to others and produced music there himself.

{¶ 8} North considered Demmons, who was 20 years old in October 2012, to be like a little brother. Demmons would come over to North's home every other day to record music with North. Demmons lived with his girlfriend, but he often stayed at the home of Cynthia Poole, who lived at 8143 Mount Charles Drive, approximately five houses south of North's home; Demmons grew up with Poole's children and had known Poole his "whole life."

{¶ 9} Stinson was Poole's then-boyfriend, and Demmons had met Stinson at Poole's home a couple of months before North's murder. In September 2012, Stinson had asked Demmons if he knew anyone from whom Stinson could buy powder cocaine ("girl"). Demmons was aware that North used marijuana and sold both marijuana and cocaine. Demmons had called North and asked if he would sell drugs to Stinson. North

had agreed and Demmons had taken Stinson to North's home, where North and Demmons completed the transaction. North sold drugs to Stinson two or three other times; Demmons was always with Stinson when Stinson was at North's residence.

{¶ 10} On the morning of Wednesday, October 10, 2012, Takahashi drove North to a drive thru, where North purchased two cans of beer. Takahashi indicated that North typically bought only one can for himself, and she asked him if were expecting someone. North responded to her that he was "just stress[ed] out." Takahashi dropped North off at their home and then proceeded to work.

{¶ 11} Demmons testified that, at approximately 10:00 a.m. or 11:00 a.m. on October 10, Stinson called him and told him that North had sold Stinson fake cocaine ("fleece"); Stinson had made a similar allegation to Demmons a couple of days before. Stinson told Demmons that he wanted his money back. Demmons called North to tell North that he and Stinson were coming to North's house. Demmons testified that Stinson brought a satchel with clothing and other items with him.

{¶ 12} Once there, Stinson confronted North about North's "supposedly fleecing him." North denied the allegation, and the men argued. Demmons apologized to North for "bringing trouble to his [North's] house," grabbed Stinson, and led Stinson to the front door. North headed down the hallway to his studio. As Demmons and Stinson got to the front door, Stinson turned around and shot North in the back of the head with a silver and black semiautomatic weapon. The shot was fatal.

{¶ 13} Demmons testified that Stinson pulled on "doctor gloves." Stinson's friend, who Demmons identified as "Walls", drove up to North's house in a blue Ford Explorer, came inside, and also put on gloves. The two men then began to put North's music

equipment and other items in bags. Demmons testified that "Walls" also disabled a smoke detector, because it had started to go off.

{¶ 14} Demmons testified that Stinson wore an earring in one ear and that Stinson took an earring from North's ear. Takahashi and Demmons both testified that North wore the same earrings in both ears every day; they described the earrings as "box shape, black diamonds" and "black flame with black diamond like a square." The coroner testified that North had only one earring when his body arrived at the coroner's office.

{¶ 15} Stinson, Demmons, and "Walls" remained at North's house approximately 10-15 minutes. Stinson told Demmons to carry some of North's possessions, in a duffle bag, out to Walls's truck; Demmons complied. They then drove to the home of Gerry Stinson, Jesse Stinson's cousin, at 130 Garfield Street. While they were driving, Jesse Stinson mentioned that he had forgotten his bag of clothes at North's house; Demmons had last seen the bag in the studio. After arriving at the Garfield residence, Demmons saw North's studio equipment and other items being taken into the residence.

{¶ 16} Gerry Stinson testified that, on October 10, he woke up to find Jesse Stinson and "Jimmy" talking with Gerry's roommate, Dujuan Patton, in Patton's bedroom. At some point, Jesse Stinson and "Jimmy" went out to the front porch. Gerry Stinson overheard Jesse Stinson and "Jimmy" discussing a robbery. From the living room, Gerry heard Jesse say something about somebody "freezing up" and Jesse asked Jimmy about why Jimmy "didn't ring the doorbell." Gerry did not hear a response to the question. Gerry next heard Jimmy ask Jesse, "Why'd you shoot him?" Gerry Stinson testified on redirect examination that Jesse Stinson did not say anything in response to the question. The next day, Gerry Stinson noticed that there was recording equipment in the house that

he had not seen before.

{¶ 17} Takahashi returned home from work around 5:00 p.m. on October 10. She went in the front door using her key, but it appeared to her that the door was already unlocked. When she walked in, she found North lying on the floor, face down near the end of the hallway and unresponsive. One of his earrings was missing. While checking on North, she could see into the studio and immediately saw that items were missing and the room was in disarray. She also noticed that the smoke detector was also removed. Takahashi called the police.

{¶ 18} At trial, Takahashi testified that a laptop, keyboard, a music device, a television, a microphone, and an Xbox were missing from the studio. Takahashi's iPod and iPod dock were missing from her bedroom. A DVD player was taken from the living room. Takahashi had told a detective that two pairs of boots were also stolen. A broken Xbox and the television in the living room were not taken.

{¶ 19} Officer Michael Reckner, an evidence technician, responded to Takahashi's call. Other officers and paramedics responded soon afterward. Officer Reckner checked on North, informed the paramedics what was going on, took Takahashi outside, and began to photograph the scene. When the paramedics were done, the officers went outside while a search warrant was obtained.

{¶ 20} Officer Phillip Green was called to North's Mount Charles residence as part of a critical incident response team. (The paramedics had already left when Green arrived.) Neither Reckner nor Green saw indications that the house had been broken into. Detective James Gebhart, the lead detective, testified that several items were collected for fingerprinting and that some cameras and a voice recorder were also

collected. One of the cameras, a Bell & Howell Take 1 digital video recorder, was found under a "pile of clothing" in the studio; a plastic bag with a toothbrush and other items was next to the pile.

{¶ 21} On October 12, 2012, Takahashi located items in the studio that did not belong with North. The items consisted of a t-shirt, jeans, underwear, sunglasses, a toothbrush, deodorant, and shaver; some items were located in a plastic bag and others were lying nearby. Takahashi also found a glass with white powder inside. She took all of the items to the Huber Heights police station and gave them to Detective Gebhart.

{¶ 22} On October 17, 2012, Officer Bradley Reaman went to 8180 Mount Charles to photograph empty merchandise boxes for some of the items that were stolen, including boxes for a MXL V53M condenser microphone, Sylvania wireless headphones, Oxygen 25 24-key USB MIDI controller, and a MSi laptop. He also photographed the smoke alarm that had been removed from the ceiling.

{¶ 23} The Huber Heights police conducted interviews with Demmons on three separate days: October 12, November 9, and November 21. Demmons originally told the police that he had last seen North on the Sunday or Monday before the homicide (which occurred on a Wednesday); he had denied being at North's house on October 10 and knowing who had shot North. Demmons had told the police that Stinson had a .380 caliber gun. On November 9, after the police mentioned to Demmons the possibility of a reward for information, Demmons suggested to the police that Stinson was involved in the homicide.

{¶ 24} Detective Gebhart testified that the police began to focus on Stinson on November 9, 2012, after a conversation with Demmons. On November 16, a search

warrant was executed at Poole's home, 1843 Mount Charles. A box of .380 caliber ammunition was found in a filing cabinet. Detectives also found medical records related to Stinson's child and vinyl surgical gloves; Poole was a nurse and used gloves for her employment.

{¶ 25} On November 19, 2012, Detective Greg Stose, using the alias Lindsey Stark, sent a Facebook friend request to Jesse Maurice Stinson; the request was accepted. Stinson's Facebook page advertised certain items for sale, including two flat screen televisions and a laptop computer. Stose, as Stark, communicated several times with Stinson through Facebook messaging about Stark's desire to purchase the laptop. At approximately 10:00 a.m. on November 20, 2012, they arranged to meet at the McDonalds on South Main Street in Dayton. Stose coordinated with Dayton police officers and the United States Marshals' Southern Ohio Fugitive Apprehension Strike Team (SOFAST) to cover that location.

{¶ 26} Shortly after noon on November 20, Stinson arrived at the McDonalds in a white vehicle, driven by a woman; Gerry Stinson was also in the vehicle. Gerry Stinson testified that Jesse Stinson had a gun with him. At the McDonalds, Stinson and Stose (who was observing Stinson from another vehicle) continued to communicate via Facebook. At one point, Stinson sent a message asking for Stark's phone number. Detective Stose had a female detective pose as Stark, and Stinson arranged with "Stark" to meet at the 111 Building, located at 111 West First Street in downtown Dayton. Dayton police and SOFAST officers relocated to that area.

{¶ 27} Stinson and his companions drove to the 111 Building, and Stinson got out of the white vehicle. Detective Joey Myers, a uniformed Dayton police officer assigned

to SOFAST, saw the white vehicle in the road behind the 111 Building and Stinson walking towards it. Myers jumped out of his vehicle and ordered Stinson to stop. Stinson ran, and Myers pursued him on foot. As Stinson went over a chain link fence near the building, Myers saw Stinson "violently slam" a laptop into the ground and then continue to run. Myers lost sight of Stinson for seven to ten seconds, and then relocated him. Stinson was apprehended on Ludlow Street after other officers in vehicles cut him off. Detective Myers asked another officer to retrieve the laptop Stinson had thrown down. The laptop's serial number matched the laptop stolen from North's residence.

{¶ 28} At approximately 2:00 p.m. on November 20, a salon customer went to the Talbot Tower, located at 131 Ludlow Street in downtown Dayton, for an appointment. The customer saw a gun in a large planter outside the building and informed salon employees, who contacted the police. Dayton Police Officer Steven Bryant, an evidence technician, collected the firearm, a Jimenez Arms .380 semiautomatic pistol; the magazine had four .380 caliber bullets inside. Bryant swabbed the pistol for DNA.

{¶ 29} Later on November 20, police officers executed a search warrant at 130 South Garfield. The officers recovered a microphone, stand, headphones, keyboard, mixer, game controller, Xbox 360 and power supply, a security door brace, two pairs of Coogi-brand boots, and two additional microphones and cables. Several of the items correlated to the merchandise boxes at North's residence.

{¶ 30} On November 21, the police interviewed Demmons again, after he was arrested for possible involvement in the homicide. Jesse Stinson and Gerry Stinson were under arrest at that time. Demmons implicated Stinson in the homicide and explained what he had witnessed on October 10, 2012.

{¶ 31} Still photographs from the Bell & Howell camera (found in the studio) were processed. Several of the photographs had been posted to Stinson's Facebook page, including several "selfies" of Stinson.

{¶ 32} Amy Dallaire, a forensic scientist at MVRCL, tested the DNA from the firearm that Officer Bryant collected. Her tests revealed a partial mixture of DNA, meaning it contained DNA from multiple people, and four (out of 15) areas of the DNA profile were found in the sample. Stinson could not be excluded as a possible contributor to the DNA. Dallaire testified that 1 in 132 people could also be possible contributors. Neither Demmons's nor Gerry Stinson's DNA was compared to the sample.

{¶ 33} Chris Monturo, firearm and tool mark examiner for MVRCL, tested the gun. The gun was found to be operable. Monturo compared a bullet fired from the Jimenez Arms .380 semiautomatic pistol to the bullet removed from North's head during the autopsy. Monturo opined that the bullet that killed North was fired from the Jimenez Arms .380 pistol.

{¶ 34} Ervin Burnham, a computer forensic examiner, examined the laptop at Detective Gebhart's request. Gebhart had asked Burnham to determine ownership of the computer and also look for information on North, Stinson, Takahashi, and Lindsey Stark; Burnham did not look for any other names. He got 7,415 "hits" on North, 992 hits on Takahashi, 665 hits on Stinson, and 66 hits on Stark. It appeared that Stinson had used the computer, and many of the active files involved Stinson. The hits for North, Takahashi and Stark were in the computer's unallocated space. He testified that the operating system had been reinstalled on November 20, 2012, and that it would appear to the average user that the information regarding Takahashi and North had been deleted.

Burnham was able to recover the information. Burham concluded that the laptop belonged to North and/or Takahashi.

{¶ 35} For purposes of the weapons under disability charge, the State submitted two judgment entries for Jesse Stinson in Case No. 2007-CR-3323, which showed a conviction for possession of cocaine, a fourth-degree felony. The first judgment entry imposed a sentence of community control for the offense, and the second imposed an eight-month sentence for Stinson's violation of community control. Defense counsel stipulated that Stinson was the defendant in that case.

{¶ 36} The defense called six witnesses on Stinson's behalf. Huber Heights Police Officer Robert Hartman, an evidence technician, testified that he responded to 8180 Mount Charles on October 10, 2012 as part of the critical response team. Hartman dusted for fingerprints on all of the doors and anything that appeared to have been touched inside the studio. Hartman could not dust the beer can, because it was cold and had condensation on it, but he was able to lift latent prints from the drinking glass in the studio.

{¶ 37} Jennifer Yoak, a forensic scientist in the fingerprint section of MVRCL, testified that she received fingerprint and palm prints of North, a latent print card, a partially empty water bottle, and a U.S. Polo shoebox. She obtained sets of fingerprints of Stinson and of Demmons from the fingerprint database. Several latent prints that had been taken from the drinking glass were identified as belonging to Demmons.

{¶ 38} Cynthia Poole testified that she was Stinson's girlfriend in October 2012 and that Stinson stayed with her at her residence. She recognized the Bell & Howell video camera found at North's house as belonging to Stinson, but she testified that Stinson had

loaned the video camera to Demmons in September 2012. A couple of weeks later, Demmons had told Stinson that he had lost it. Poole also testified that she recognized State's Exhibit 91 as gloves she used for work. She testified that they were size small, too small for Stinson's hands. Poole indicated that the ammunition found in her room belonged to her, but she did not own or possess a firearm when her home was searched. Poole acknowledged that State's Exhibit 105, a pair of jeans, belonged to Stinson, but she suggested that Demmons might have borrowed them. Poole did not know Stinson to use drugs, but indicated he drank "quite a bit."

{¶ 39} Aaron Ballard, who is known as "Walls," testified that he became friends with Jesse Stinson through Gerry Stinson. Ballard denied being friends with Demmons, but knew who Demmons was. Ballard also denied being involved with the events of October 10, 2012. He specifically denied going to 8180 Mount Charles Street, picking up Demmons in a vehicle, and transporting Demmons to Garfield Street. Ballard stated that he did not know where Mount Charles Street was, that his license was suspended then, that he had a cast on his arm around that time, and his girlfriend drove him around.

{¶ 40} Dujuan Patton testified that he was friends with Stinson and slightly knew Demmons. In the fall of 2012, Patton lived at 130 Garfield and Jesse Stinson sometimes stayed there. Patton saw Demmons at the Garfield residence "probably every day, every other night." Patton indicated that Demmons would wear other people's clothes. Patton testified that, in October 2012, Demmons called him and, based on that call, Patton drove Demmons to Demmons's girlfriend's home in Vandalia, where Demmons picked up some duffle bags, and then Patton drove Demmons back to the Garfield residence. When Patton returned home later that night, a studio was set up at the house. Patton described

the studio equipment as microphones, a microphone stand, laptops, and a keyboard. Patton acknowledged that he did not provide this information to the police.

{¶ 41} Clarence Sampson, an investigator for the Public Defender's Office, stated that he had interviewed Gerry Stinson about two weeks before trial and asked Gerry about the statement he (Gerry) had provided to the police; Gerry Stinson told Sampson that he (Gerry) had lied in his police statement. Gerry told Sampson that he (Gerry) had not heard Demmons ask Jesse Stinson, "Why did you shoot him?"

{¶ 42} Detective Gebhart testified again for the State as a rebuttal witness. He stated that he had met with Poole in preparation for trial, and Poole had told him that Stinson had lost the video camera only after Gebhart told Poole that the camera was found at the scene of a homicide. Poole did not say that the camera had been given to Demmons. Gebhart further testified that he introduced himself to Patton when the search warrant was executed at 130 Garfield in November 2012; Patton did not get in touch with Gebhart after that date.

{¶ 43} In his first assignment of error, Stinson claims that his convictions were against the manifest weight of the evidence. Stinson emphasizes that Demmons's testimony was not credible and that other evidence implicated Demmons as the perpetrator. Stinson's second assignment of error challenges the sufficiency of the State's evidence for the same reasons raised in his first assignment of error. He further argues that there was insufficient evidence to support the aggravated robbery conviction, because there was no evidence that Stinson "tried or intended to commit a theft offense until after the murder occurred." We will address the sufficiency argument first.

{¶ 44} Viewing the evidence in the light most favorable to the State, as we must

when determining the sufficiency of the State's case, the State presented sufficient evidence to convict Stinson of murder, aggravated robbery, aggravated burglary, and having a weapon under disability. The State's evidence indicated that Stinson went to North's home with Demmons, that Stinson argued with North about drugs, and that Stinson shot North in the back of his head, killing North. According to Demmons, Stinson had brought the gun and surgical gloves with him, and Stinson and "Walls" stole musical recording equipment, electronics, and other items from North's home and took them to 130 Garfield. That Stinson intended to commit a theft offense when he entered North's house was supported by the facts that Stinson brought surgical gloves with him and had prearranged for "Walls," who had a truck, to come to North's home. The State presented evidence that Stinson later attempted to sell the stolen laptop, and he discarded the laptop and the gun used in the shooting as he ran from the police. Finally, the State presented the judgment entries from a prior conviction for possession of cocaine, which disqualified Stinson from possessing a firearm. Stinson's second assignment of error is overruled.

{¶ 45} Stinson's manifest weight argument is based primarily on his contention that the jury lost its way in crediting Demmons's testimony regarding what had occurred at North's residence on October 10, 2012. Stinson argues that Demmons repeatedly changed his story when talking to the police and that other evidence implicated Demmons in the crimes. Specifically, Stinson emphasizes that (1) Demmons's fingerprints were on the glass next to the still-cold beer can found in the studio, (2) Demmons knew where Stinson kept drugs in his studio and this drawer had been pulled out, while others were undisturbed, (3) non-working items, such as an Xbox, were not taken from North's residence, implying that someone close to North was involved; (4) Patton had testified

that Demmons brought the studio equipment from his girlfriend's residence to 130 Garfield; (5) Ballard denied being at 8180 Mount Charles on October 10, knowing where that residence was located, and driving Stinson and Demmons to 130 Garfield; and (6) Stinson's motive for the murder "simply does not make sense." Stinson states, "The jury clearly lost its way when it convicted the Appellant based solely on the testimony of Demmons."

{¶ 46} Demmons's version of events was corroborated by several pieces of evidence. Two days after the shooting, Stinson's clothing and other personal property, including his Bell & Howell video camera, were found by Takahashi in North's studio. Poole confirmed that the jeans and the video camera belonged to Stinson. Surgical gloves and .380 caliber bullets were located in Poole's house, where Stinson was living. Although Stinson was living with Poole in October 2012, he often stayed at 130 Garfield, where his cousin, Gerry Stinson, lived. Many of North's stolen belongings were located at 130 Garfield. One of North's earrings was missing after the shooting; Stinson wears a single earring. Gerry Stinson testified that he overheard Jesse Stinson and "Jimmy" discussing a robbery and he (Gerry) heard Jimmy ask Jesse Stinson, "Why'd you shoot him?" Stinson did not respond to the question. Detective Stose, using an alias, "friended" Stinson on Facebook and arranged to purchase a laptop from Stinson. Officers observed Stinson throw down the laptop, which had been stolen from North's residence, and the gun used to commit the homicide was recovered that day in the area where Stinson fled from the police. Accordingly, we disagree with Stinson's assertion that his conviction was based "solely on the testimony of Demmons."

{¶ 47} Through cross-examination and the presentation of its own witnesses, the

defense presented evidence attacking Demmons's credibility. As Stinson notes, Demmons told differing stories to the police on several occasions, and the fact that broken electronics were not taken suggested that someone close to North was involved in the robbery. Poole suggested that Demmons left Stinson's camera and clothing in the studio, and there was evidence that Demmons used the drinking glass in the studio. Ballard denied being at 8180 Mount Charles, and Clarence Sampson testified that Gerry Stinson had told him (Sampson) that he (Gerry) lied in his police statement.

{¶ 48} It was the province of the jury to assess the witnesses' credibility and determine whether the State had proven its case beyond a reasonable doubt. And while the jury could have reasonably concluded that Demmons had not been entirely truthful, we cannot conclude that the jury lost its way when it convicted Stinson of the charged offenses. Stinson's first assignment of error is overruled.

## II. Motion for a New Trial

{¶ 49} In his third assignment of error, Stinson claims that the trial court erred "when it failed to declare a mistrial or grant the Appellant a new trial."

{¶ 50} On September 30, 2014, after he was found guilty, but prior to sentencing, Stinson moved for a new trial, pursuant to Crim.R. 33(A)(1) and (A)(5). Stinson argued in his motion that the trial court had erred in failing to grant his motion for a mistrial, in allowing the jury to be instructed on complicity, and in allowing the jury to rehear, during deliberations, the testimony of two State's witnesses.

{¶ 51} "A trial court's decision on a Crim.R. 33 motion for a new trial will not be reversed absent an abuse of discretion." *State v. Metcalf*, 2d Dist. Montgomery No. 26101, 2015-Ohio-3507, ¶ 4. An "abuse of discretion" implies an arbitrary,

unreasonable, or unconscionable attitude on the part of the court. *State v. Ulery*, 2d Dist. Clark No. 2010-CA-89, 2011-Ohio-4549, ¶ 9, citing *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980).

{¶ 52} During the cross-examination of Detective Gebhart, defense counsel asked the detective whether the items found in North's studio that allegedly belonged to Stinson (pants, toothbrush, deodorant, etc.) and other recovered evidence had been submitted for forensic analysis. Gebhart testified that he had not asked for testing on those items.

{¶ 53} On redirect examination, the State asked Gebhart whether he had continued to follow evidentiary leads and to submit evidence to the crime laboratory after Stinson was identified as a suspect. Gebhart stated that he had. The prosecutor then asked: "Had -- during your career as a detective, have you or yourself (sic) been familiar with others in your field been asked to provide something to the crime lab so that a defense request for analysis could be done?" Defense counsel objected to the prosecutor's question.

{¶ 54} In a sidebar discussion, defense counsel asserted that the prosecutor's question suggested that the defense had a burden with respect to the investigation. The court responded, "Okay, I don't think that was there. But under the utmost of caution rephrase it. Basically the crime lab is not a subsection I assume of the Prosecutor's office * * * [t]hat anybody, including defense lawyers, can submit things to be tested. Is that fair?" Defense counsel replied, "That's fair." The prosecutor then asked Detective Gebhart:

> Q: Let me phrase it this way, detective. Is the Miami Valley Regional Crime
>
> Lab; is that in any way an arm of law enforcement? Is it limited to just

police investigators who can submit evidence?

A: No.

Q: Anybody can submit evidence, including a defense attorney if they wish?

A: Yes.

Defense counsel objected to the last question, and the trial court overruled the objection.

{¶ 55} After the conclusion of Detective Gebhart's testimony and before the State's next witness was called, defense counsel requested a mistrial. Counsel explained, "At the previous sidebar we had discussed an appropriate way to address the issue of defense submission of forensic evidence, and I believe we reached a consensus about that. I'm of the opinion the prosecution went beyond that, and that effectively shifted the burden of proof."

{¶ 56} The prosecutor responded: "I did exactly what we talked about at sidebar. I didn't believe I went any -- this is not an unusual -- when the argument is raised about things that were and were not tested, it doesn't shift the burden, but it's a fact that other things could be tested. There will be a sufficient instruction in this case, and there has been already. And even from the State during voir dire you've been very clear the Defendant has no burden. I don't think this jury is going to be left with any question about that."

{¶ 57} The trial court agreed. It stated:

Right. And just so it's clear, when we kind of went through a scenario before I didn't agree with you that it indicated a shift in burden. Just since we could change the wording, why not? And I'm not sure the prosecutor

exactly said what we said. It may have been closer to the other one. It certainly wasn't done purposely, and it's the same language I've heard in every case since basically that's submitting evidence which I don't think goes to the burden of proof. So I think she changed the language. I don't think it was exactly the words that we said up here, but I think it was consistent with what we talked about up here. And again, I'm not sure where it talked anywhere about shifting the burden. So the motion for mistrial is overruled. (Tr. 863.)

{¶ 58} "The granting or denial of a motion for mistrial rests in the sound discretion of the trial court." *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). We find no abuse of discretion in this case. At the outset, we do not agree with Stinson that the prosecutor's questions shifted the burden of proof to him. In addition, the Supreme Court of Ohio has repeatedly stated (in the context of closing argument) that the State may comment on the failure of the defense to offer evidence in support of its case. *E.g., State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 293; *State v. Clemons*, 82 Ohio St.3d 438, 452, 696 N.E.2d 1009 (1998); *State v. Williams*, 23 Ohio St.3d 16, 19-20, 490 N.E.2d 906 (1986). The trial court did not abuse its discretion in overruling Stinson's motion for a new trial based on the denial of his motion for a mistrial.

{¶ 59} Stinson argues that the cumulative effect of several alleged errors by the trial court deprived him of a fair trial. The alleged errors concern the trial court's jury instruction on aiding and abetting, the replaying of two witnesses' testimony during deliberations, and the prosecutor's rebuttal closing argument.

{¶ 60} First, Stinson argues that the trial court erroneously gave an instruction on

aiding and abetting, over defense counsel's objection. Stinson asserts that the State's case was based on a theory that Demmons was an innocent bystander, not an accomplice, and therefore "there was no other person present who could have aided and abetted in the commission of the Murder, Aggravated Robbery or Aggravated Burglary." Stinson argues that the complicity instruction allowed the jury to consider finding him guilty based on his having aided and abetted Demmons.

{¶ 61} "A criminal defendant has a right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Williford*, 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990); *State v. Mullins*, 2d Dist. Montgomery No. 22301, 2008-Ohio-2892, ¶ 9. As a corollary, a court should not give an instruction unless it is specifically applicable to the facts in the case. *State v. Fritz*, 163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823, ¶ 19 (2d Dist.). The decision to give a requested jury instruction is a matter left to the sound discretion of the trial court, and the court's decision will not be disturbed on appeal absent an abuse of discretion. *State v. Elliott*, 2d Dist. Montgomery No. 26104, 2014-Ohio-4958, ¶ 22.

{¶ 62} The State requested and the trial court gave, over Stinson's objections, an instruction on aiding and abetting. R.C. 2923.03(A)(2), which defines complicity, states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." A charge of complicity may be stated in the terms of R.C. 2923.03, or in terms of the principal offense. R.C. 2923.03(F). "As a result, a defendant who is indicted as a principal offender is on notice that evidence could be presented that he was either the principal offender or an aider and abettor." (Citation omitted.) *State v. Boyce*, 2d Dist. Clark No. 11 CA 95, 2012-Ohio-

3713, ¶ 19.

{¶ 63} The State's theory, based in part on Demmons's testimony, was that Stinson was the shooter and that Stinson, with the aid of "Walls," stole recording equipment and additional items from North's home. Nevertheless, considering *all* of the evidence presented at trial, including the evidence offered by the defense, a jury could have reasonably concluded that Stinson and Demmons were complicit in the murder, aggravated robbery, and aggravated burglary. The trial court reasonably provided an instruction on aiding and abetting, as that issue was raised by the evidence.

{¶ 64} Second, Stinson argues that the trial court erred in allowing the jury to review the testimony of two witnesses – Gerry Stinson and Demmons – during deliberations. Stinson claims that allowing the jury to review just two witnesses in a weeklong trial put undue influence on those witnesses' testimony.

{¶ 65} "It is well settled that a trial court, upon a request from the jury, 'may cause to be read all or part of the testimony of any witness.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 123, quoting *State v. Berry*, 25 Ohio St.2d 255, 267 N.E.2d 775 (1971), paragraph four of the syllabus; *State v. Gamble*, 2d Dist. Montgomery No. 25639, 2014-Ohio-1277, ¶ 34.

{¶ 66} Here, the jury sent the trial court a note, asking, "Could we please see/hear the witness testimonies from James Deddens [sic] and Gerry Stinson?" Defense counsel objected to the request on the ground that it would give undue weight to those witnesses' testimony. Counsel further expressed that the jury should be required to watch all of the testimony.

{¶ 67} After a discussion with counsel, the court returned the note to the jury with

the following written response: "Yes, you may view the testimony, but you must watch the entire testimony of the witness or witnesses. You may watch the testimony of any witness, but you are cautioned to view it in the context of all the evidence presented at trial." (Court Ex. IV.) The record does not reflect whether the jury watched Demmons's and/or Gerry Stinson's testimony again.

{¶ 68} The trial court was permitted to allow the jury to rehear Demmons's and Gerry Stinson's testimony. By requiring the jury to watch the witness's entire testimony, the trial court ensured that the direct examination, cross-examination, and any additional questioning would be repeated. The court further cautioned the jury to view the testimony in the context of all evidence, thus reducing the possibility that the jury would give those witnesses' testimony undue emphasis. We presume the jury complied with the trial court's instructions. Accordingly, we find no error in the trial court's response to the jury's request.

{¶ 69} Finally, Stinson argues that he was entitled to a new trial due to the prosecutor's repeated statements during rebuttal closing argument that defendant's counsel's closing arguments were an "invitation to detour." Stinson did not object to the prosecutor's argument, and we find no basis to conclude that the prosecutor's statement affected Stinson's substantial rights.

{¶ 70} In summary, the trial court did not err in denying Stinson's motion for a new trial. Stinson's third assignment of error is overruled.

### III. Allied Offenses of Similar Import – Murder and Aggravated Robbery

{¶ 71} Stinson's fourth assignment of error alleges that the trial court erred in failing to merge aggravated robbery with murder. Stinson had asserted at trial that those

charges should merge "because they're the same continuous course of conduct."

{¶ 72} Ohio's allied offense statute, R.C. 2941.25, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 73} The Supreme Court of Ohio recently clarified the standard to be used when determining whether offenses merge as allied offenses of similar import. *State v. Ruff*, 143 Ohio St.3d 114, 2014-Ohio-995, 34 N.E.3d 892. The supreme court summarized:

Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple

offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Ruff* at ¶ 30-31. The supreme court explained that two or more offenses are of dissimilar import "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23. *See State v. Ervin*, 2d Dist. Champaign No. 2014-CA-23, 2015-Ohio-3688, ¶ 12.

{¶ 74} In this case, Stinson was sentenced on Count One (murder as a proximate result of felonious assault - deadly weapon), Count Five (aggravated robbery – deadly weapon), and Count Eight (having weapons under disability). The aggravated burglary count (Count Seven) and the three additional three murder counts (Counts Two, Three, and Four) merged with Count One; aggravated robbery was the predicate offense for Counts Three and Four. A second aggravated robbery count (Count Six) merged with Count Five.

{¶ 75} The felony murder statute, R.C. 2903.02(B), provides: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." The aggravated robbery statute, R.C. 2911.01(A)(1), provides: "No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall do any of the following: * * * Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish

it, indicate that the offender possesses it, or use it."

{¶ 76} Several courts, including this court, have held that the offenses of aggravated robbery and murder do not merge when the force used to effectuate an aggravated robbery is far in excess of that required to complete the robbery, or where the circumstances suggest that a separate intent to kill existed. *E.g., State v. Jackson*, 2d Dist. Montgomery No. 24430, 2012-Ohio-2335, ¶ 140 (where victim-drug dealer was shot four times during robbery, trial court could have reasonably concluded that the force was excessive or that defendant had separate intent to kill) (citing cases from other appellate districts). *See also State v. Kerby*, 2d Dist. Clark No. 2013 CA 31, 2014-Ohio-3358, ¶ 17 (involuntary manslaughter and aggravated robbery did not merge where defendant's use of force to prevent victim from calling the police exceeded that necessary to complete the robbery); *State v. Reid,* 2d Dist. Montgomery No. 25790, 2014-Ohio-1282, ¶ 13 (stating, in dicta, that (1) the aggravated robbery and aggravated murder were committed separately where the robbery occurred after defendant shot and followed the victim in his car and (2) shooting the victim multiple times at close range exceeded the force necessary to complete the robbery).

{¶ 77} Here, the State's evidence indicated that Stinson went to North's home with a gun and surgical gloves, and that he had arranged for Walls to meet him at North's home. Demmons testified that Stinson went to North's home to discuss Stinson's belief that North had sold him fleece. After arguing with North about the drugs, Stinson shot North as North walked away toward his studio. Stinson then pulled out the gloves, provided gloves to Walls (who arrived shortly after the shooting), and stole items from North's house. These facts demonstrate that the shooting and the robbery were

committed with a separate animus and that the force used against North exceeded the force necessary to complete the robbery. The trial court did not err in failing to merge the murder and aggravated robbery offenses as allied offenses of similar import.

{¶ 78} Stinson's fourth assignment of error is overruled.

### IV. Conclusion

{¶ 79} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

Dylan Smearcheck
Kirsten A. Brandt
William O. Cass, Jr.
Hon. Barbara P. Gorman