[Cite as *State v. Koch*, 2019-Ohio-4182.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28041 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-1987/2 |
| | : | |
| BARIS KOCH | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of October, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

CHARLES BLUE, Atty. Reg. No. 0074329, 401 E. Stroop Road, Kettering, Ohio 45429
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Baris Koch was convicted after a jury trial in the Montgomery County Court of Common Pleas of two counts of felonious assault (deadly weapon – Count One, and serious physical harm – Count Two). The trial court sentenced him to community control for a period not to exceed five years.[1]

{¶ 2} Baris[2] appeals from his convictions, challenging two jury instructions, the allowance of lay opinion testimony regarding surveillance videos, and the admission of evidence of a prior altercation between many of the same participants on the same day, but for which Baris was not present. For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 3} The evidence at trial established the following facts.

{¶ 4} The complainant, Aydin Akhmdov, was initially self-employed as a long-distance truck driver. During this time, Aydin stored his truck at Ameripro Logistics, a local trucking company owned and managed by three brothers, Mustafa, Sobir, and Sevil Shakhmanov, Baris's cousins. Aydin testified that he was also familiar with a different nearby trucking company owned by the Koch family, which consisted of brothers Murad, Izmir, and Baris. At some point in 2015, Mustafa hired Aydin as a driver for Ameripro. After approximately two months, Aydin broke his leg in an accident and was unable to work. Aydin testified that when he stopped working for Ameripro, he was paid $1,050

---

[1] The trial court's online docket reflects that Koch's community control has been successfully terminated. Given that Koch's convictions involved felony offenses, his appeal nevertheless is not moot.

[2] Because several of the individuals involved in the altercations share the same last names, we will refer to them by their first names.

for mileage, but was still owed an additional $1,800.

{¶ 5} Aydin stated that for several months, he contacted Mustafa many times, unsuccessfully, in an effort to recover the $1,800. Mustafa eventually blocked Aydin's phone number. On June 7, 2016, Aydin called and reached Sevil, who told Aydin to come to the Ameripro office to get his back pay. Aydin testified that he went to Ameripro later that day, but the doors were locked and he was unable to locate anyone. Aydin tried to reach Sevil again, but when he (Aydin) did not reach him (Sevil), Aydin left. After he left Ameripro, Aydin noticed that Sevil had called him several times. Aydin called Sevil back and was told to return to Ameripro if he wanted to be paid. Aydin returned in his blue Honda Civic approximately 15 minutes later.

{¶ 6} Surveillance cameras located outside the Ameripro office recorded the encounter between Aydin and members of the Shakhmanov and Koch families. In the video, Aydin can be seen arriving at Ameripro and parking his car at a tire business across Valley Street from Ameripro. Aydin testified that as he sat in his parked car, he observed Sevil remove a tire iron from his car and hide it in his pants. The video shows that Aydin got out of his vehicle and stood in the tire business parking lot, facing Ameripro's lot. Sevil and Mustafa walked to the edge of the Ameripro lot, and the two men can be seen attempting to call Aydin across the street. When Aydin refused to cross the street, Sevil, Mustafa, and their brother, Sabir, who had joined them, walked across the street to where Aydin was standing.

{¶ 7} While the three men talked to Aydin, Izmir and Murad Koch drove up in a white BMW sedan and parked behind where all of the men were talking, perpendicular to Aydin's Honda. At that point, the men surrounded Aydin. Aydin moved next to the

driver's side door of his Honda, and the group moved with him. After the apparent verbal disagreement continued there for approximately 40 seconds, Aydin attempted to walk away from the men. Murad ran toward Aydin and repeatedly hit him with a collapsible metal baton as Aydin attempted to back away. After Aydin ran between some vehicles parked nearby, all five men followed him and began beating him. Aydin testified that during the assault, Sevil struck him in the head with a tire iron. The physical assault lasted for approximately 20 seconds, and it stopped when an unconnected person intervened. The men continued to engage verbally.

{¶ 8} At this juncture, Baris and Kamil Abbasov, another cousin, drove into the tire business's parking lot in a black SUV. While still verbally arguing with the Shakhmanovs, Izmir and Murad, Aydin returned to his vehicle and left the scene in his Honda. As Aydin drove away, the video depicts Mustafa picking up a rock and throwing it at Aydin's vehicle. Thereafter, Izmir and Baris relocated their vehicles to Ameripro's parking lot.

{¶ 9} After Aydin left, Mustafa and Sevil could be seen in the Ameripro lobby, talking with Kamil. Sobir repeatedly looked out the lobby door. At one point, the video shows Baris standing in the lobby doorway, looking into the building. Baris later can be seen walking through the Ameripro lobby, talking on his phone. Baris does not appear on the video for approximately five to seven minutes. Approximately nine minutes after the end of the first altercation, Murad and Izmir left Ameripro in the white BMW.

{¶ 10} Approximately 12 minutes after the first encounter, Aydin returned to Ameripro, again parking his vehicle across the street in the tire business's parking lot. Aydin got out of his vehicle and leaned against the hood, facing Ameripro. He was armed with brass knuckles and a pocket knife in his pocket. Aydin testified that he shouted at

Sevil from across the street regarding the back pay he was owed. The video depicts Sevil responding by making a profane gesture directed at Aydin.

{¶ 11} A few minutes after Aydin returned, the Shakhmanov brothers can be seen in the Ameripro lobby placing metal poles and rebar just inside the door of the business. At one point, Baris stood in the doorway looking toward Aydin. (Tr. at 678.)

{¶ 12} Approximately six minutes after Aydin returned, Murad and Izmir also returned in their white BMW and parked in the Ameripro side parking lot. Murad, armed with a metal baton, began yelling at Aydin from across the street and started walking toward Aydin in the Ameripro parking lot. Izmir followed a short distance behind, followed by Sevil. Murad walked across the street to where Aydin was standing. Aydin testified that they were yelling at him as they approached him, stating that they were going to "tear him to pieces." When Murad approached him with the metal baton (still lowered), Aydin pulled out a pocketknife and stabbed Murad in the arm. Thereafter, Aydin attempted to run away but was chased by Murad, Izmir, and Sevil. Mustafa, armed with rebar, ran up to the group and joined the fray.

{¶ 13} While the group chased Aydin, Baris came out of the Ameripro lobby, and he, Kamil, and Sobir watched from the front Ameripro parking lot. Aydin tripped and fell down in the tire business's parking lot, at which point Mustafa began striking him with a metal pole and Izmir can be seen kicking him in the head and upper body. Murad also ran up and struck Aydin with a metal pole. Aydin testified that Sevil was about to hit him with a metal pole. Aydin, however, was able to retrieve the set of brass knuckles from his pocket and strike Sevil, knocking him to the ground. Aydin then ran across the street toward the Ameripro office in an effort to escape from his attackers.

{¶ 14} Upon reaching the parking lot in front of Ameripro, however, Aydin was struck in the head from behind with a metal pole by Murad. When Aydin fell to the ground, Murad, Mustafa, and Kamil began hitting him with metal poles. Izmir, who did not have a weapon, could be seen kicking Aydin in the head. Thereafter, Sobir pulled his brothers and cousins away from Aydin. Eventually, Aydin was able to stand up and walk back across the street toward where his car was parked. Baris had not yet participated in the second altercation.

{¶ 15} At this point, another individual at Ameripro, named Aziz, called 911 after seeing the injury to Murad's arm; he reported that someone had been stabbed.

{¶ 16} Izmir followed Aydin across the street and continued arguing with him. As Aydin neared his car, he turned around and began walking back toward the tire business and Izmir. The video shows Izmir and Aydin fighting. At this juncture, Baris ran across the street and jump-kicked Aydin in the head, knocking him either into a wooden fence or to the ground by a wooden fence. Mustafa, Murad, and Kamil also ran across the street to continue attacking Aydin.

{¶ 17} The video shows that Aydin walked away and continued arguing with Izmir and Mustafa. As Sobir, Murad, and Baris joined Mustafa, Baris took off his shirt and attempted to wrap Murad's arm. Several men chased Aydin behind the wooden fence where the assault apparently continued. The video appears to show Baris trying, unsuccessfully, to keep Murad from going behind the fence. Baris then also went behind the fence.

{¶ 18} The video did not capture what occurred behind the fence, but Aydin testified that he saw a baseball bat on the ground, picked it up, hit Mustafa a couple of

times with it, and then the bat was taken away was him. Aydin testified "all seven people," meaning the Shakhmanovs, the Kochs, and Abbasaov, assaulted him behind the fence. Aydin testified that Baris "was beating me, too." (Tr. at 373.) The group was behind the fence for approximately 52 seconds. Murad came out from behind the fence carrying the baseball bat.

{¶ 19} Twenty-six seconds after the group left the fenced area, Aydin walked out from behind the fence without his shirt and wearing only one shoe. Aydin walked to his vehicle and got inside, but when he tried to leave, Izmir walked over to the vehicle, reached into the front passenger side window and took the key out of the ignition. Thereafter, Aydin simply remained seated in his vehicle and waited for the police, who arrived moments later.

{¶ 20} During the initial assault, Aydin suffered a cut to his head when Sevil struck him with a tire iron. Aydin also required stitches and staples to close wounds on his head. Aydin testified that he had bruises "all over [his] body" and wounds on his back, legs, arms, face, belly, and eyes. Aydin stated that as a result of the assaults, he continues to suffer from headaches. At trial, Baris stipulated that Aydin suffered serious physical harm during the assaults, but he did not stipulate to his having caused serious physical harm. (Tr. at 449.)

{¶ 21} Detective Chad Jones was assigned as lead detective on the case. After visiting the scene, he went to Miami Valley Hospital, where Aydin, Mustafa, Murad, Izmir, and Sevil were taken with injuries. After speaking with Mustafa, Izmir, Murad, and Mustafa, Jones decided to have Aydin arrested for assault. The following morning, Jones reviewed the surveillance video obtained by Detective Copley. Jones concluded

that the reports of the Shakhmanovs and Kochs were inconsistent with the video, and he arranged for Aydin's release.

{¶ 22} Jones later interviewed Baris. Jones testified that Baris told him (Jones) that while his family was inside the Ameripro lobby, he (Baris) was telling everyone to lock the doors, stay inside, and call the police. Baris stated that the police had been called about 45 minutes before they arrived. Baris described Murad as the "peacemaker" in the group, and he told Jones that he did not see Murad get stabbed. Jones further testified that Baris said that he jumped and kicked Aydin in defense of Izmir. Baris also told Jones that he went behind the fence because he (Baris) heard Mustafa screaming. Jones testified that Baris indicated that, once behind the fence, he (Baris) "got a hold [of] Aydin and used his foot to push Mustafa off. And that him [sic] and Aydin fell to the ground, and that * * * he [Baris] was hit after that." (Tr. at 867-868.) Baris told Jones that Aydin was on top of him. (*Id.* at 869.)

{¶ 23} On July 5, 2016, Baris – along with his brothers and the Shakhmanovs – was indicted on two counts of felonious assault (deadly weapon and serious physical harm). Kamil was indicted separately on July 20, 2016. At his request, Baris's case was severed from those of his co-defendants. Prior to trial, the State presented proposed jury instructions regarding complicity.

{¶ 24} The matter proceeded to a jury trial commencing on April 16, 2018. The State presented five witness: (1) Sergeant Brian Lewis of the Montgomery County Sheriff's Office, the administrative sergeant in charge of the Regional Dispatch Center; (2) Detective Sean Copley, who recovered the surveillance videos from the scene; (3) Aydin, the complainant; (4) Officer John Malott, an evidence technician who responded

to the scene; and (5) Detective Chad Jones, the lead detective. The State also presented numerous exhibits, including surveillance videos of the incident. The surveillance videos were played throughout Aydin's and Jones's testimony. Baris did not present any witnesses.

{¶ 25} At the conclusion of the testimony, Baris's counsel brought a Crim.R. 29 motion for acquittal on both counts. With respect to Count II (serious physical harm), counsel argued that the State's bill of particulars raised complicity only for Count I (deadly weapon), and there was no evidence that Baris caused serious physical harm to Aydin. (Tr. 906-908.) The court found that Baris was on notice regarding complicity for both counts, and it overruled the motion. The jury subsequently was instructed on complicity for both charges.

{¶ 26} The parties and the court further discussed self-defense/defense of another jury instructions. Both parties agreed that Baris could receive instructions on defense of another without testifying when there was other evidence indicative of self-defense. The State did not object to Baris's receiving those instructions in this case. Baris's counsel stated that they were requesting an instruction based on Baris's defense of Izmir and Mustafa. (Tr. at 914.) Baris's counsel initially argued that self-defense based on non-deadly force was the appropriate instruction, because the matter should be viewed based on the actions taken by the defendant; the State asserted that a deadly force instruction was also appropriate, looking at the force to which Baris was responding. The parties and the court reviewed modified instructions on the last day of trial; those instructions included defense of another through both deadly and non-deadly force. Defense counsel did not object to the jury's receiving both instructions.

{¶ 27} After deliberations, the jury found Baris guilty of both offenses. The trial court subsequently sentenced him to community control, which he has completed successfully.

{¶ 28} Baris appeals from the trial court's judgment, raising four assignments of error.

## II. Jury Instructions

{¶ 29} In his first and second assignments of error, Baris claims that the trial court erred in instructing the jury on defense of another with deadly force and on complicity with respect to Count Two (serious physical harm).

{¶ 30} "A criminal defendant has a right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Williford*, 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990); *State v. Mullins*, 2d Dist. Montgomery No. 22301, 2008-Ohio-2892, ¶ 9. As a corollary, a court should not give an instruction unless it is specifically applicable to the facts in the case. *State v. Stinson*, 2d Dist. Montgomery No. 26449, 2015-Ohio-4405, ¶ 61; *State v. Fritz*, 163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823, ¶ 19 (2d Dist.).

{¶ 31} "When reviewing the trial court's jury instructions, the proper standard of review is whether the trial court's decision to give or exclude a particular jury instruction was an abuse of discretion under the facts and circumstances of the case." (Citation omitted.) *State v. Fair*, 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 65. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 32} At the outset, Baris did not object to the court's jury instructions. Accordingly, he has forfeited all but plain error with respect to the jury instructions. In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected Baris's substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Singleton*, 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 45.

*A. Defense of Another – Deadly Force*

{¶ 33} In his first assignment of error, Baris claims that the trial court erred in instructing the jury on defense of another through the use of deadly force, because there was no evidence that he used deadly force. (The State agreed at trial that Baris did not have a weapon or use deadly force personally.) Baris thus claims that the jury received an instruction that involved "a more rigid standard for defense of others than was appropriate under the circumstances."

{¶ 34} "Defense of another is a variation of self-defense. Under certain circumstances, one may employ appropriate force to defend another individual against an assault. However, 'one who intervenes to help a stranger stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force and is guilty of an assault.' * * * Therefore, one who claims the lawful right to act in defense of another must meet the criteria for the affirmative defense of self-defense." *State v. Wenger*, 58 Ohio St.2d 336, 340, 390 N.E.2d 801

(1979). *Accord State v. Turner*, 2d Dist. Montgomery No. 24322, 2011-Ohio-5417, ¶ 13.

**{¶ 35}** In Ohio, self-defense involving the use of *deadly* force requires proof of three elements: 1) the defendant did not create the violent situation, 2) the defendant had a bona fide belief that he was in danger of death or great bodily harm and that the only way to escape was the use of force, and 3) the defendant did not violate any duty to retreat. *State v. Martin*, 2d Dist. Montgomery No. 27220, 2017-Ohio-7431, ¶ 39, citing *Williford*, 49 Ohio St.3d 247, 551 N.E.2d 1279. To justify the use of deadly force, the defendant must show that no means of retreat or avoidance was available to him and that his only means of escape or avoidance was the deadly force he used. *State v. Dale*, 2d Dist. Montgomery No. 2012-CA-20, 2013-Ohio-2229, ¶ 15, citing *State v. Kucharski*, 2d Dist. Montgomery No. 20815, 2005-Ohio-6541, ¶ 20.

**{¶ 36}** In contrast, self-defense involving the use of *non-deadly* force requires proof that: (1) the defendant was not at fault in creating the situation giving rise to the altercation; and (2) that the defendant had reasonable grounds to believe and an honest belief, even if mistaken, that the defendant was in imminent danger of bodily harm and (3) the only means of protecting himself or herself from that danger was by the use of force not likely to cause death or great bodily harm. *State v. Coleman*, 2d Dist. Montgomery No. 27666, 2018-Ohio-1951, ¶ 13, quoting *State v. Pigg*, 2d Dist. Montgomery No. 25549, 2013-Ohio-4722, ¶ 36.

**{¶ 37}** At the time of Baris's trial, a defendant bore the burden of proving self-defense.[3] *Martin* at ¶ 41; *Dale* at ¶ 18.

---

[3] Ohio's self-defense statute, R.C. 2901.05, was amended, effective on March 28, 2019 (almost three years after the offenses and approximately a year after the trial). The statute now provides that "[i]f, at the trial of a person who is accused of an offense that

{¶ 38} Upon review of the entire record, we find no plain error in the trial court's decision to provide jury instructions on the use of both deadly force and non-deadly force regarding defense of another. The evidence at trial reflected a series of physical encounters between Aydin and the Shakhmanov and Koch families. The surveillance videos, which did not include sound, left several factual matters for the jury's determination, such as whether Aydin was acting aggressively or defensively when he took certain actions, including when Aydin hit Mustafa with the baseball bat while behind the fence and during his encounter with Izmir shortly before Baris kicked him (Aydin). Moreover, the evidence could have supported a conclusion that Baris acted alone in defending Mustafa and Izmir as well as the alternative conclusion that he acted with the intention of joining his brothers and cousins when he assaulted Aydin. We find no plain error in the trial court's decision to instruct the jury on the use of both deadly force and non-deadly force so that the jury could consider defense of another based on the various possible reasonable findings available to it.

{¶ 39} Baris's first assignment of error is overruled.

*B. Complicity*

{¶ 40} In his second assignment of error, Baris claims that the trial court erred in instructing the jury on complicity with respect to Count Two (serious physical harm). Baris emphasizes that a complicity instruction for Count Two is contrary to the conduct

---

involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be." R.C. 2901.05(B)(1). Baris does not claim that the current version of the statute applies retroactively to him.

alleged in the bill of particulars for that offense.

**{¶ 41}** Baris was charged with felonious assault, in violation of R.C. 2903.11(A)(1) and R.C. 2903.11(A)(2); the indictment did not cite the complicity statute. On October 12, 2017, in response to Baris's request, the State filed a bill of particulars for the charged offenses. It read, in significant part:

> * * * [T]he indictment and discovery in this case are sufficient to convey the nature of the charges pending against the defendant. The exact date of the offense is contained within the indictment, filed on July 5, 2016. The information about the exact time of the offense contained within the indictment is contained within the discovery that has been disclosed. The exact place of the offense contained within the indictment is also contained within the discovery that has been disclosed. However, pursuant to the Defendant's request the State provides the following:
>
> **COUNT ONE:**
>
> As to Count One of the indictment, the State will prove that Defendant, on or about JUNE 7, 2016 in the County of Montgomery, aforesaid, and State of Ohio, did knowingly cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance. The offense is Felonious Assault (deadly weapon), a felony of the second degree, in violation of Section 2903.11(A)(2) of the Ohio Revised Code. Defendant committed this offense in the area of 1602 Valley St., Dayton, Ohio by striking the victim Aydin Akhmedov with various metal objects including a tire iron and rebar, and/or encouraging, aiding or

abetting others in doing so. See police report, video surveillance and discovery previously provided.

**COUNT TWO:**

As to Count Two of the indictment, the State will prove that Defendant, on or about JUNE 7, 2016 in the County of Montgomery, aforesaid, and State of Ohio, did knowingly cause serious physical harm to another. The offense is Felonious Assault (serious harm), a felony of the second degree, in violation of R.C. 2903.11(A)(1) of the Ohio Revised Code. Defendant committed this offense in the area of 1602 Valley St., Dayton, Ohio by striking the victim Aydin Akhmedov causing temporary, substantial incapacity; permanent or temporary, serious disfigurement; and/or acute pain of such duration as to result in substantial suffering or any degree of prolonged or intractable pain. See police report, video surveillance and discovery previously provided.

{¶ 42} At trial, the trial court's jury instructions included a section entitled "Aider and Abettor." The instructions began, "The law provides two ways in which a defendant may be found responsible for *either or both counts*:

1) the defendant was the principal offender; that is, the defendant did all the acts that make up all the elements of a particular offense charged in the indictment; or

2) the defendant aided and abetted one or more persons in committing an offense or offenses, knowing that he was facilitating an offense charged in the indictment.

(Emphasis added.) As stated above, Baris's counsel challenged the applicability of complicity to Count II as part of the Crim.R. 29 motion, but counsel did not object to the jury instruction on complicity.

{¶ 43} We find no plain error in the court's jury instruction that complicity could be considered for either or both offenses. R.C. 2923.03 provides that a defendant who joins with another to commit an offense may be charged as a principal offender. *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 21; *see also State v. Hancher*, 2d Dist. Montgomery No. 23515, 2010-Ohio-2507, ¶ 5, citing R.C. 2923.03(F) ("A person who is complicit in an offense may be charged and punished as if he were the principal offender, and a charge of complicity may be stated * * * in terms of the principal offense."). " 'To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' " *Hancher* at ¶ 5, quoting *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001); *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 27. The requisite criminal intent may be inferred from the circumstances of the crime, *id.*, including from "presence, companionship and conduct before and after the offense is committed." *Grissom* at ¶ 21, quoting *Johnson* at 245. "An aider and abettor is 'punished as if he were a principal offender.' " *Id.*, quoting R.C. 2923.03(F).

{¶ 44} In *State v. Herring*, 94 Ohio St.3d 246, 762 N.E.2d 940 (2002), the Ohio Supreme Court addressed whether a jury instruction on complicity violated the defendant's Sixth Amendment right "to be informed of the nature and cause of the

accusation" when the bill of particulars specified that the defendant was the principal offender in an aggravated murder. The Court held that "R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense." *Id.* at 251. The supreme court further stated that "Crim.R. 33(E)(2) provides that a variance between the allegations and the evidence at trial is not reversible error unless the defense is prejudiced or misled thereby." *Id.* The Court noted that the defendant knew before trial that complicity was at issue in other counts and that the defendant had not shown prejudice. *Id.*

**{¶ 45}** Here, Baris was charged with two counts of felonious assault as a principal offender, and R.C. 2923.03(F) served as notice that the State could argue that he was guilty of those offenses as an aider and abettor. Although the bill of particulars only mentioned complicity with respect to Count I (deadly weapon), the record reflects that the State's case against Baris was based, in large part, on the theory that he joined in the assaults perpetrated by his cousins and brothers. And, in April 2018, prior to trial, the State filed a written motion requesting an instruction on complicity. We find no basis to conclude that Baris's substantial rights were violated by the court's jury instruction on complicity.

**{¶ 46}** Baris's second assignment of error is overruled.

### III. Lay Testimony Regarding Surveillance Video

**{¶ 47}** In his third assignment of error, Baris claims that the trial court erred in permitting the State's witnesses "to render opinion testimony regarding the contents of the surveillance video of the incident." Baris argues that Aydin, to some extent, and Jones, to a large extent, were permitted to testify to events on the video that they did not

personally observe. Baris asserts that such testimony constituted improper lay witness opinion testimony and "clearly touched upon issues that were within the province of the jury."

**{¶ 48}** Pursuant to Evid.R. 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704.

**{¶ 49}** "Evid.R. 701 grants the trial court wide latitude in allowing or controlling lay witness opinion testimony." *State v. Kehoe*, 133 Ohio App.3d 591, 603, 729 N.E.2d 431 (12th Dist.1999); *see also State v. Ollison*, 2016-Ohio-8269, 78 N.E.3d 254, ¶ 39 (10th Dist.). Generally, we review the decisions of the trial court concerning lay witness testimony for an abuse of discretion. *Id.*

**{¶ 50}** We find no error in the State's questioning of Aydin regarding the contents of the video. Aydin experienced the incident depicted in the video, which did not have sound and often portrayed evidence occurring across Valley Street from the camera. Aydin was reasonably permitted to testify about the unrecorded communications between the parties, about the individuals involved, and to clarify what occurred based on his perspective. Baris cites one particular question posed to Aydin, asking whether it was

Izmir's "left arm that he seems to be showing to this person." (Tr. at 380.) Defense counsel objected, arguing that "showing" was speculative. We find no error in allowing Aydin to testify as to his perception of this specific action.

**{¶ 51}** Detective Jones agreed that he was not present during the altercations, but testified that he reviewed the videos as the lead detective on the case. *See State v. Groce*, 2019-Ohio-1007, __ N.E.3d __, ¶ 46 (10th Dist.) (although the testifying detective did not personally make or appear in the surveillance video, he had personal knowledge of the contents of the video as it related to his investigation). A significant portion of Jones's direct testimony provided a description of the activities depicted on the surveillance video as the video was played. Near the beginning of this questioning, defense counsel objected on the ground that the testimony was cumulative, which was overruled. (Tr. at 665.) Baris's counsel asked for a continuing objection to Detective Jones's testimony "on the basis of cumulative," and the court allowed the continuing objection. (*Id.*) Counsel did not object on the ground that Jones's testimony regarding the video constituted improper lay opinion testimony. Accordingly, we review the argument raised on appeal for plain error.

**{¶ 52}** To the extent that Jones's testimony merely provided his own interpretation or characterization of Aydin's, Baris's, and Baris's family members' actions as depicted on the video, we agree that such testimony was not proper opinion testimony. Jones did not observe the altercations on Valley Street, and the jurors were able to view the surveillance video themselves to reach conclusions about what occurred. *See State v. Eddy*, 2017-Ohio-741, 86 N.E.3d 144, ¶ 54 (8th Dist.) (detective's testimony, based on reviewing a video, as to who shot first was not admissible where "detective did not witness

the shooting, nor was his testimony helpful to the jury as the jurors were capable of viewing the video themselves to determine exactly what it did or did not know regarding who shot first").

**{¶ 53}** However, to the extent that Jones's testimony regarding the events shown on the surveillance video provided context or additional information that could be helpful to the jury, Jones was permitted to comment on the video. *See, e.g., State v. Walker*, 2019-Ohio-1458, __ N.E.3d __ (10th Dist.) (officer provided proper opinion evidence about activities depicted on a video when he limited his testimony to "his opinions, based on his experience in law enforcement and investigating narcotics cases, of what he thought the video depicted in terms of drug trafficking and manufacture"); *State v. Coots*, 2015-Ohio-126, 27 N.E.3d 47 (2d Dist.) (court did not err in allowing officer to give opinion testimony that person in surveillance video was the defendant, where the opinion was based on the officer's personal observation of the defendant's general physical mannerisms over a two-year period).

**{¶ 54}** Much of Jones's testimony focused on creating a time line of the events, including, for example, when Baris arrived, the time that elapsed between Aydin's departure and return between altercations, and the total time behind the fence. The detective's timeline of events was based on Jones's viewing of the video and was arguably beneficial to the jury's determination of the ultimate issues.

**{¶ 55}** In addition, portions of Jones's testimony discussing what occurred on the video were connected to other portions of Jones's testimony concerning the police investigation. For example, Jones was asked what weapons the individuals involved appeared to be holding, and was later asked whether those weapons were located during

the police investigation. (Tr. at 712.) Detective Jones also testified regarding portions of the video that contradicted statements that Baris had made, such as that Murad was a "peacemaker." (Tr. at 728.) In addition, using the video, Detective Jones identified the location of a witness to the altercation who had called 911.

{¶ 56} Moreover, defense counsel extensively and effectively cross-examined Detective Jones using the surveillance video. Defense counsel elicited testimony that Aydin had reported that certain events occurred during the altercations that were belied by the video. For example, after replaying many minutes of the video, counsel asked Detective Jones about Aydin's return to the scene:

Q Let's pause it and talk for a minute. Aydin tells you, and he tells us here today, or yeah, this week, that he went back to the scene to get his phone?

A Yes, sir.

Q But in this video do we not see him on his phone?

A It appears he's on a phone, or something to his head.

(Tr. at 774.)

{¶ 57} Defense counsel further elicited testimony from Jones that portions of Jones's report regarding the events portrayed on the videos were inconsistent with what actually occurred, based on his viewing of the videos at trial. At one point during cross-examination, Jones agreed that he had written in his report that Murad raised his stick over his head when approaching Aydin at his car at the beginning of the second encounter; Jones conceded that the video did not show Murad raising his stick and that the report was "false." (Tr. at 772.)

{¶ 58} Upon review of Detective Jones's testimony in its entirety, we cannot

conclude that Detective Jones's statements characterizing Baris's and other individuals actions as shown on the video violated Baris's substantial rights and rose to the level of plain error.

**{¶ 59}** Baris's third assignment of error is overruled.

### IV. Evidence Regarding Prior Assault

**{¶ 60}** In his fourth assignment of error, Baris claims that the trial court erred in allowing evidence regarding the first altercation between Aydin and Baris's relatives, when Baris did not participate in that altercation.   He asserts that the evidence was not relevant.

**{¶ 61}** During Detective Jones's testimony, defense counsel raised an objection to "any more introduction of evidence that is prior to Baris['s] doing anything."   Counsel argued:

> * * * Government appears to be trying to hold him responsible for the actions
> of others because he did not call the police, because he did not try to
> remove weapons from people, because he stands there as weapons are
> being put by the door.   Mere presence – and we are going to ask for this
> instruction – is insufficient to show complicity and so any and all of this
> evidence we think should be excluded and they should be barred from any
> argument that any of this behavior prior to him actively running towards
> Aydin, as seen on the video, is improper and no basis for a conviction on
> the basis of complicity.

(Tr. at 676.)   The trial court overruled the objection, stating "I think it's a fact issue for the jury to decide as to whether or not there is complicity here."

{¶ 62} Relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A).

{¶ 63} A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 14. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

{¶ 64} We find no abuse of discretion in the trial court's determination that evidence of the first altercation, in which Baris was not involved, was nevertheless relevant to the issue of complicity. Baris drove up as the first altercation was ending, and he parked in the tire store's parking lot where the altercation occurred. Baris spent time with his relatives in the Ameripro lobby following the first altercation, and those interactions arguably were relevant to the jury's determination of whether Baris acted in concert with his brothers and cousins when he assaulted Aydin during the second altercation.

{¶ 65} Baris's fourth assignment of error is overruled.

**V. Conclusion**

**{¶ 66}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck
Andrew T. French
Charles Blue
Hon. Mary L. Wiseman