[Cite as *State v. Shakhmanov*, 2019-Ohio-4705.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28066 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-1987/1 |
| | : | |
| MUSTAFA SHAKHMANOV | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of November, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ANTHONY R. CICERO, Atty. Reg. No. 0065408, 500 East Fifth Street, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

**{¶ 1}** Defendant-appellant Mustafa Shakhmanov appeals from his conviction for felonious assault. He contends the trial court erred by denying his motion to suppress evidence and by denying his request to make the jury aware of a statement made by the victim as the victim was leaving the witness stand. Mustafa also claims the trial court erred with regard to jury instructions. Finally, he contends he is entitled to a new trial and, at this trial, retroactive application of the burden shifting changes made by the Ohio General Assembly to Ohio's self-defense statute, R.C. 2901.05. For the reasons set forth below, we affirm.

## I. Facts and Procedural History

**{¶ 2}** Aydin Akhmdov worked as a driver for Ameripro Logistics, L.L.C. (hereinafter Ameripro), a Dayton trucking company owned by Mustafa.[1] In 2015, Aydin broke his leg and was unable to work. Aydin claimed that when he stopped working, he was owed $1,800. Aydin claimed that, over the course of several months, he attempted to contact Mustafa regarding the money owed. On June 7, 2016, Aydin was informed, by Mustafa's brother, Sevil, he should come to the Ameripro offices.

**{¶ 3}** In *State v. Koch*, 2d Dist. Montgomery No. 28041, 2019-Ohio-4182, an appeal filed by one of Mustafa's co-defendants[2], this court set forth the following description of the events that occurred when Aydin arrived at the Ameripro offices:

---

[1] Mustafa's brothers Sobir and Sevil were also involved in the altercations underlying this appeal. Since they all share the same last name, we will refer to them by their first names.

[2] *Koch* involves the appeal of Baris Koch, who along with his brothers Izmir and Murad were also involved in the subject altercations.

Surveillance cameras located outside the Ameripro office recorded the encounter between Aydin and members of the Shakhmanov and Koch families. In the video, Aydin can be seen arriving at Ameripro and parking his car at a tire business across Valley Street from Ameripro. Aydin testified that as he sat in his parked car, he observed Sevil remove a tire iron from his car and hide it in his pants. The video shows that Aydin got out of his vehicle and stood in the tire business parking lot, facing Ameripro's lot. Sevil and Mustafa walked to the edge of the Ameripro lot, and the two men can be seen attempting to call Aydin across the street. When Aydin refused to cross the street, Sevil, Mustafa, and their brother, Sabir [sic], who had joined them, walked across the street to where Aydin was standing.

While the three men talked to Aydin, Izmir and Murad Koch drove up in a white BMW sedan and parked behind where all of the men were talking, perpendicular to Aydin's Honda. At that point, the men surrounded Aydin. Aydin moved next to the driver's side door of his Honda, and the group moved with him. After the apparent verbal disagreement continued there for approximately 40 seconds, Aydin attempted to walk away from the men. Murad ran toward Aydin and repeatedly hit him with a collapsible metal baton as Aydin attempted to back away. After Aydin ran between some vehicles parked nearby, all five men followed him and began beating him. Aydin testified that during the assault, Sevil struck him in the head with a tire iron. The physical assault lasted for approximately 20 seconds, and it

stopped when an unconnected person intervened. The men continued to engage verbally.

At this juncture, Baris [Koch] and Kamil Abbasov, another cousin, drove into the tire business's parking lot in a black SUV. While still verbally arguing with the Shakhmanovs, Izmir and Murad, Aydin returned to his vehicle and left the scene in his Honda. As Aydin drove away, the video depicts Mustafa picking up a rock and throwing it at Aydin's vehicle. Thereafter, Izmir and Baris relocated their vehicles to Ameripro's parking lot.

After Aydin left, Mustafa and Sevil could be seen in the Ameripro lobby, talking with Kamil. Sobir repeatedly looked out the lobby door. At one point, the video shows Baris standing in the lobby doorway, looking into the building. Baris later can be seen walking through the Ameripro lobby, talking on his phone. Baris does not appear on the video for approximately five to seven minutes. Approximately nine minutes after the end of the first altercation, Murad and Izmir left Ameripro in the white BMW.

Approximately 12 minutes after the first encounter, Aydin returned to Ameripro, again parking his vehicle across the street in the tire business's parking lot. Aydin got out of his vehicle and leaned against the hood, facing Ameripro. He was armed with brass knuckles and a pocket knife in his pocket. Aydin testified that he shouted at Sevil from across the street regarding the back pay he was owed. The video depicts Sevil responding by making a profane gesture directed at Aydin.

A few minutes after Aydin returned, the Shakhmanov brothers can be seen in the Ameripro lobby placing metal poles and rebar just inside the door of the business.   * * *

Approximately six minutes after Aydin returned, Murad and Izmir also returned in their white BMW and parked in the Ameripro side parking lot. Murad, armed with a metal baton, began yelling at Aydin from across the street and started walking toward Aydin in the Ameripro parking lot.   Izmir followed a short distance behind, followed by Sevil.   Murad walked across the street to where Aydin was standing.   Aydin testified that they were yelling at him as they approached him, stating that they were going to "tear him to pieces."   When Murad approached him with the metal baton (still lowered), Aydin pulled out a pocketknife and stabbed Murad in the arm. Thereafter, Aydin attempted to run away but was chased by Murad, Izmir, and Sevil.   Mustafa, armed with rebar, ran up to the group and joined the fray.

While the group chased Aydin, Baris came out of the Ameripro lobby, and he, Kamil, and Sobir watched from the front Ameripro parking lot. Aydin tripped and fell down in the tire business's parking lot, at which point Mustafa began striking him with a metal pole and Izmir can be seen kicking him in the head and upper body.   Murad also ran up and struck Aydin with a metal pole.   Aydin testified that Sevil was about to hit him with a metal pole.   Aydin, however, was able to retrieve the set of brass knuckles from his pocket and strike Sevil, knocking him to the ground. Aydin then ran

across the street toward the Ameripro office in an effort to escape from his attackers.

Upon reaching the parking lot in front of Ameripro, however, Aydin was struck in the head from behind with a metal pole by Murad. When Aydin fell to the ground, Murad, Mustafa, and Kamil began hitting him with metal poles. Izmir, who did not have a weapon, could be seen kicking Aydin in the head. Thereafter, Sobir pulled his brothers and cousins away from Aydin. Eventually, Aydin was able to stand up and walk back across the street toward where his car was parked. * * *

At this point, another individual at Ameripro, named Aziz, called 911 after seeing the injury to Murad's arm; he reported that someone had been stabbed.

Izmir followed Aydin across the street and continued arguing with him. As Aydin neared his car, he turned around and began walking back toward the tire business and Izmir. The video shows Izmir and Aydin fighting. At this juncture, Baris ran across the street and jump-kicked Aydin in the head, knocking him either into a wooden fence or to the ground by a wooden fence. Mustafa, Murad, and Kamil also ran across the street to continue attacking Aydin.

The video shows that Aydin walked away and continued arguing with Izmir and Mustafa. As Sobir, Murad, and Baris joined Mustafa, Baris took off his shirt and attempted to wrap Murad's arm. Several men chased Aydin behind the wooden fence where the assault apparently continued.

The video appears to show Baris trying, unsuccessfully, to keep Murad from going behind the fence. Baris then also went behind the fence.

The video did not capture what occurred behind the fence, but Aydin testified that he saw a baseball bat on the ground, picked it up, hit Mustafa a couple of times with it, and then the bat was taken away was him. Aydin testified "all seven people," meaning the Shakhmanovs, the Kochs, and Abbasaov, assaulted him behind the fence. Aydin testified that Baris "was beating me, too." (Tr. at 373.) The group was behind the fence for approximately 52 seconds. Murad came out from behind the fence carrying the baseball bat.

Twenty-six seconds after the group left the fenced area, Aydin walked out from behind the fence without his shirt and wearing only one shoe. Aydin walked to his vehicle and got inside, but when he tried to leave, Izmir walked over to the vehicle, reached into the front passenger side window and took the key out of the ignition. Thereafter, Aydin simply remained seated in his vehicle and waited for the police, who arrived moments later.

*Id.* at ¶ 6 - 19.

{¶ 4} On July 5, 2016, Mustafa, Sevil, Sobir, Izmir, Murad and Baris were each indicted on one count of felonious assault (deadly weapon), and one count of felonious assault (serious physical harm). Kamil was indicted on July 20, 2016. Mustafa filed a motion to suppress seeking to suppress the seizure of the surveillance video taken from his office at Ameripro. He later filed an amended motion to suppress arguing that he did

not give valid consent for the seizure. The trial court overruled the motion and the matter proceeded to trial. The jury found Mustafa guilty as charged, and the trial court sentenced him to community control sanctions.

{¶ 5} Mustafa appeals.

## II. Consent Analysis

{¶ 6} Mustafa's first assignment of error states as follows:

THE TRIAL COURT ERRED BY HOLDING THAT MUSTAFA GAVE CONSTITUTIONALLY VALID CONSENT FOR THE COLLECTION OF THE SURVEILLANCE VIDEO.

{¶ 7} Mustafa contends that the trial court erred in denying his motion to suppress the surveillance video. Specifically, he argues that the court was incorrect when it found that he voluntarily provided the police with oral and written consent to seize the surveillance video. His argument hinges upon the issue of the credibility of the law enforcement personnel who secured his consent.

{¶ 8} "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted). *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) *Id.* With this standard of review in mind, we turn to the issue of consent.

{¶ 9} Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject to only a few well-established exceptions. *State v. Cosby*, 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 16 (2d Dist.). Valid consent to search is one of the recognized exceptions to the warrant requirement. *State v. Moon*, 2d Dist. Montgomery No. 9288, 1986 WL 2368, *1 (Feb. 14, 1986). In order for a warrantless search to be valid based on consent, "[t]he State is required to establish, by clear and convincing evidence, that consent to the search was freely and voluntarily given." (Citations omitted.) *State v. Powell*, 2d Dist. Champaign No. 2012 CA 14, 2012-Ohio-5104, ¶ 17. The voluntariness of the consent is determined from the totality of the circumstances. *Id.* "Consent may be oral or written." *State v. McLemore*, 197 Ohio App.3d 726, 2012-Ohio-521, 968 N.E.2d 612, ¶ 24 (2d Dist.), quoting Katz, *Ohio Arrest, Search and Seizure*, Section 19:1 (2008). "While not necessary after oral consent is given, a written consent is strong evidence of a defendant's willingness to allow a search." (Citation omitted.) *State v. Hill*, 2d Dist. Montgomery No. 25717, 2014-Ohio-1447, ¶ 12.

{¶ 10} "The following factors are generally used in Ohio to decide if a defendant's consent to search has been given voluntarily: '(1) whether the defendant's custodial status was voluntary; (2) whether coercive police procedures were used; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his or her right to refuse consent; (5) the defendant's education and intelligence; [and] (6) the defendant's belief that no incriminating evidence will be found.' " *State v. Mabry*, 2d Dist. Montgomery No. 26242, 2015-Ohio-4513, ¶ 15, quoting *State v. Black*, 2d Dist. Montgomery No. 23524, 2010-Ohio-2916, ¶ 36-41.

{¶ 11} In this case, Dayton Police Officer Willie Hooper testified at the suppression

hearing. He testified that he was sent to Miami Valley Hospital to meet with Mustafa. Mustafa was not in custody. Hooper testified he informed Mustafa that the police wanted to see the surveillance recording of the incident and that Mustafa's consent to retrieve the recording was needed because Mustafa was the owner of Ameripro. Hooper testified that he did not have a problem communicating with Mustafa and that Mustafa stated he was able to understand Hooper. [3] Hooper also testified that Mustafa was very cooperative and gave oral consent for the police to take the surveillance recording. Hooper testified that he then placed a call to Detective Chad Jones, placed the telephone on loudspeaker mode, and repeated the request for oral consent which was, again, given. Hooper testified that he did not make any promises or threats to Mustafa, that Mustafa was not hesitant about giving oral consent, and that Mustafa did not request a lawyer at that time.

{¶ 12} Jones also testified at the motion to suppress. His testimony corroborated Hooper's testimony that Mustafa gave verbal consent to the seizure of the surveillance tape. Jones testified that he then seized the surveillance video based upon the oral consent.

{¶ 13} Mustafa testified at the suppression as well. He denied having been asked for oral consent and testified that when he initially met with the police, they simply asked him to sign a written consent form. He further testified that he did not understand everything on the consent form and therefore attempted to contact his attorney. When he was unable to reach his attorney, Mustafa called an employee at Ameripro who,

---

[3] This testimony is supported by the fact that at both the suppression hearing and trial, Mustafa declined constant translation from the certified interpreter and stated that he would use them when/if he needed assistance.

according to Mustafa, informed him that the police had already taken the evidence. Mustafa testified that he then signed the consent form solely because the evidence was already in police possession.

{¶ 14} We find nothing inherently incredible in the testimony of Hooper and Jones. Their testimony was sufficient to conclude, based upon the totality of the circumstances, that Mustafa's oral consent was voluntary. Therefore, we need not reach the issue of the written consent.

{¶ 15} We conclude that the trial court did not err in denying the motion to suppress. Accordingly, the first assignment of error is overruled.

### III. Analysis of Aydin's Statement made to Mustafa in the Jury's Presence

{¶ 16} The second assignment of error asserted by Mustafa states:

THE TRIAL COURT ERRED BY NOT INFORMING THE JURY OF THE TRANSLATION OF A COMMENT MADE BY THE COMPLAINING WITNESS TO THE APPELLANT WITHIN THE HEARING OF THE JURY THAT COULD HAVE AFFECTED THE JURY'S EVALUATION OF THE CREDIBILITY AND DEMEANOR OF THE COMPLAINING WITNESS, IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS.

{¶ 17} Mustafa contends that the trial court violated his right to due process when it denied his request to inform the jury of a courtroom statement made by Aydin as he was leaving the witness stand.

{¶ 18} The record shows that, at the conclusion of his trial testimony, Aydin walked past the table where Mustafa and his counsel were seated. As he did so, he made a

comment in Russian.[4]   One of Mustafa's attorneys speaks Russian and was able to understand the comment.   After hearing the remark, the attorney stated, "I'm sorry, Judge.   You know on the way out he just made a terrible comment to the defendant." Tr. p. 680.   The trial court immediately excused the jury.   Counsel for Mustafa then argued that the jury should be made aware of the statement because the State "presented this witness to this jury, as somebody that is who he is not.   And as he walked out of this courtroom he showed to everybody that he can understand the Russian language, who he is.   And if this jury is not allowed to understand what he said in Russian, they're not getting a full picture of this individual."   Tr. p. 688.   The trial court denied the defense request.   Thereafter, the jury returned to the courtroom and the trial court issued the following instruction:

> Ladies and gentlemen, welcome back.   My apologies for that quick recess that we took.   As [Aydin] was exiting the courtroom there was some commotion, and a statement was made with regard to him.
>
> I want to tell you that you cannot consider that for any purpose whatsoever.   You must disregard it completely, and use it for absolutely no purpose in assessing the facts of this case and applying the law to the facts as you find them to be.
>
> You've been instructed, and you'll be instructed again, that the only evidence that you can consider in this case is the testimony that is adduced through the witnesses that are under oath on the witness stand and exhibits

---

[4] The statement was translated for the trial court by one of the certified translators present at trial as "We'll talk shit later."   Tr. p. 684.

that will be admitted for the trial for your consideration.

So I just want to make that clear that you cannot consider what just happened for any purpose whatsoever. We're just going to scrape it off and move forward.

Tr. p. 689 - 690.

{¶ 19} We begin by noting that, in our view, counsel mishandled Aydin's remark by editorializing about it in front of the jury. The better course of action would have been to ask for a sidebar conference with the trial court and the prosecutor. At that point, counsel could have asked to recall Aydin to the witness stand in order to bring the statement to the attention of the jurors. However, counsel merely asked the court to provide the statement's translation to the jury. The court correctly noted that statements made off the stand do not constitute evidence for the jury's consideration.

{¶ 20} Further, we reject defense counsel's claim that, had the statement been made in English, the jury would have been able to hear and evaluate the comment. There is nothing in the record before us to demonstrate that the jurors actually heard Aydin make the statement.

{¶ 21} Based upon this record, we cannot say that the trial court abused its discretion in denying the request to translate the statement for the jury. Accordingly, the second assignment of error is overruled.

## IV. Jury Instruction Analysis

{¶ 22} Mustafa's third assignment of error provides as follows:

THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY ON

NON-DEADLY USE OF FORCE SELF DEFENSE, AND ASSAULT AND/OR AGGRAVATED ASSAULT.

{¶ 23} Mustafa claims that the trial court erred by failing to instruct the jury on self-defense through the use of non-deadly force and by failing to give instructions on aggravated assaulted and assault.

{¶ 24} "The purpose of jury instructions is to properly guide the jury" in deciding questions of fact based on the applicable law. (Citation omitted.) *Griffis v. Klein*, 2d Dist. Montgomery No. 19740, 2005-Ohio-3699, ¶ 48. "A trial court has discretion to determine whether the evidence adduced at trial was sufficient to warrant an instruction." *State v. Austin*, 8th Dist. Cuyahoga Nos. 106215 and 106530, 2018-Ohio-3048, ¶ 54, citing *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, 883 N.E.2d 1052, ¶ 72. Thus, when reviewing jury instructions given by a trial court, the appropriate standard of review is whether the trial court abused its discretion. *State v. Pendleton*, 2d Dist. Clark Nos. 2017-CA-17, 2017-CA-9, 2018-Ohio-3199, ¶ 44, citing *State v. Underwood*, 2d Dist. Montgomery No. 26711, 2016-Ohio-1101, ¶ 9.

{¶ 25} We begin with the self-defense instruction. "[A] defense of self-defense involving the use of non-deadly force requires proof that: (1) the defendant was not at fault in creating the situation giving rise to the altercation; and (2) that the defendant had reasonable grounds to believe and an honest belief, even though mistaken, that the defendant was in imminent danger of bodily harm and the only means of protecting himself or herself from that danger was by the use of force not likely to cause death or great bodily harm." (Citations omitted.) *State v. Pigg*, 2d Dist. Montgomery No. 25549, 2013-Ohio-4722, ¶ 36.

{¶ 26} The State argues that this issue was not preserved for appeal and therefore must be reviewed under the plain error standard. Conversely, Mustafa contends that the matter was not waived because the trial court made a "unilateral decision to eliminate any question as to a duty to retreat," thereby preventing his counsel from seeking an instruction on non-deadly force self-defense.

{¶ 27} A review of the transcript shows that the court, when discussing the self-defense instruction with counsel, stated, "I believe that we have that as self-defense and defense of others as against deadly force because I see a duty to retreat there. And in the [trial of co-defendant Baris Koch], we had done sort of the deadly force duty to retreat or if it wasn't deadly force --" Tr. p. 1009. At that point, counsel for Mustafa interjected and stated, "We're fine with not having the physical harm, the non-deadly force instruction." The State then made an argument regarding the instruction, following which Mustafa's counsel stated that, based upon the facts of the case, the defense was "perfectly fine with simply [a] deadly force self-defense instruction." Tr. p. 1011.

{¶ 28} We do not read this passage as a unilateral decision by the trial court. Instead, it appears that the trial court was attempting to discuss the applicability of both deadly and non-deadly force when defense counsel interrupted and essentially stated that Mustafa was not asking for an instruction on non-deadly force. Counsel then reiterated that Mustafa was not asking for a non-deadly force instruction. Thus, we find that this matter does not involve plain error as urged by the State, but is rather a matter of invited error. " 'Under this principle, a party cannot complain of any action taken or ruling made by the court in accordance with that party's own suggestion or request.' " *Daimler/Chrysler Truck Fin. v. Kimball*, 2d Dist. Champaign No. 2007-CA-07, 2007-Ohio-

6678, ¶ 40, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 448, at 170-171 (1999, Supp.2007).

{¶ 29} In any event, we cannot say that Mustafa has shown any error. Aydin testified that Mustafa hit him in the head. The video clearly showed that Mustafa hit Aydin with a metal rod at least five times before Aydin was able to run across the street. Then three of the co-defendants are seen hitting Aydin, who was lying on the ground, with metal rods. At that point, Mustafa crossed the street and hit Aydin with the rod again. Mustafa walked away and then returned and hit Aydin with the pole once more. Each time Mustafa can be observed swinging the pole like a baseball bat.

{¶ 30} We find that the trial court could have reasonably concluded that Mustafa was not entitled to a non-deadly force self-defense instruction since he had repeatedly used a large metal rod to strike Aydin as he was lying on the ground, and who was being beaten with weapons by multiple other persons who were also using weapons. Based upon this evidence, even had Mustafa asked for the instruction, we cannot say that the trial court would have abused its discretion by denying the request.

{¶ 31} We next address Mustafa's claim that he was entitled to instructions on assault and aggravated assault. Mustafa did not seek these instructions during trial; thus, we are limited to a plain error review. "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). Failure to object waives all but plain error. *State v. Rollins*, 2d Dist. Clark No. 2005-CA-10, 2006-Ohio-5399, ¶ 14. Plain error exists if the trial outcome would clearly have been different, absent the alleged error in the trial court

proceedings. *Id.*

{¶ 32} Felonious assault and aggravated assault are nearly identical offenses; however, aggravated assault requires the additional mitigating element of serious provocation. *State v. Mack*, 82 Ohio St.3d 198, 200, 694 N.E.2d 1328 (1998). "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." (Citation omitted.) *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph five of the syllabus. In *State v. Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272 (1992), the Ohio Supreme Court elaborated on what constitutes reasonably sufficient provocation. First, an objective standard must be applied to determine whether the provocation is "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.* at 634-635. If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case "actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* This court has held that "when analyzing the subjective prong of the test, '[e]vidence supporting the privilege of self-defense, i.e., that the defendant feared for his own personal safety, does not constitute sudden passion or fit of rage.' " *State v. Harding*, 2d Dist. Montgomery No. 24062, 2011-Ohio-2823, ¶ 43, quoting *State v. Stewart*, 10th Dist. Franklin No. 10AP-526, 2010-Ohio-466, ¶ 13.

{¶ 33} The record is devoid of evidence that Mustafa was acting under the

influence of sudden passion or in a sudden fit of rage. During his testimony, Mustafa denied being angry. Instead, Mustafa repeatedly stated that he was afraid that Aydin would harm someone and that he was merely attempting to scare and disarm Aydin. Further, with regard to the second attack, the fact that Mustafa prepared by placing a metal rod near the business door belies any claim of sudden passion or rage. Thus, we cannot say that the trial court's failure to give an instruction on aggravated assault constituted error, let alone plain error.

{¶ 34} We next assess the claim that the trial court should have instructed the jury on assault as proscribed by R.C. 2903.13. That statute states in pertinent part that "[n]o person shall knowingly cause or attempt to cause physical harm to another * * * [and] [n]o person shall recklessly cause serious physical harm to another * * *." R.C. 2903.13(A) and (B).

{¶ 35} On this record, there can be no doubt that Aydin suffered *serious* physical harm, not merely physical harm. Thus, Mustafa was not entitled to an assault instruction under R.C. 2903.13(A). Further, we cannot say that the record supports a finding that Mustafa acted recklessly. Therefore, Mustafa was not entitled to an assault instruction under R.C. 2903.13(B). Thus, even had he asked for such instructions, the trial court would not have abused its discretion by denying the request. Also, we cannot say that the outcome of the trial would clearly have been otherwise had the jury been given instructions on aggravated assault or simple assault.

{¶ 36} The third assignment of error is overruled.

## V. New Trial Analysis

{¶ 37} The fourth assignment of error is as follows:

THE FAILURE TO APPLY IN THE INSTANT CASE THE RULE SET FORTH BY THE UNITED STATES SUPREME COURT IN *GRIFFITH V. KY.*, 479 U.S. 314 (1987) AND ITS PROGENY THAT NEW RULES OF CRIMINAL PROCEDURE MUST BE APPLIED RETROACTIVELY FOR ALL CASES UNDER DIRECT REVIEW AS IT APPLIES TO OHIO'S SHIFTING OF THE BURDEN OF PROOF FROM THE DEFENDANT TO THE STATE FOR THE AFFIRMATIVE DEFENSE OF SELF-DEFENSE WOULD VIOLATE THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE CONSTITUTION FOR THE STATE OF OHIO.

{¶ 38} Mustafa notes the General Assembly has amended the statute governing the burden of proof regarding the affirmative defense of self-defense, and, from this, he contends that the amendment should be applied retroactively to his case. He claims, on this basis, that his conviction should be reversed and the matter remanded for new trial.

{¶ 39} This issue was presented in co-defendant Izmir Koch's direct appeal to this court. In that case, we stated that the defendant was "not entitled to retroactive application of the burden shifting changes by the legislature to Ohio's self-defense statute, R.C. 2901.05, as a result of H.B. 228." *State v. Koch*, 2d Dist. Montgomery No. 28000, 2019-Ohio-4099, ¶ 103. For the reasons set forth in *Koch*, we conclude that Mustafa's argument lacks merit.

{¶ 40} The fourth assignment of error is overruled.

## VI. Conclusion

**{¶ 41}** All of Mustafa's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Anthony R. Cicero
Hon. Mary Lynn Wiseman